IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-cv-43

| | |
|---|---|
| CELGARD, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | ORDER |
| Vs. ) | |
| ) | |
| LG CHEM, LTD. and ) | |
| LG CHEM AMERICA, INC., ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on LG Chem, Ltd. ("LG Chem") and LG Chem America, Inc.'s ("LGCAI") (together, "Defendants") Motion to Dismiss for Lack of Personal Jurisdiction (#30); Defendants' Motion to Transfer Venue (#71); and Celgard, LLC's ("Celgard" or "Plaintiff") Motion for Preliminary Injunction (#15) and Motion for Jurisdictional Discovery (#58). The Court heard oral arguments on these motions on May 14, 2014.

Having considered the motion and reviewed the pleadings, the Court enters the following Findings, Conclusion, and Order granting Plaintiff's Motion for Jurisdictional Discovery and Motion for Preliminary Injunction to be reviewed after 60 days.

FINDINGS AND CONCLUSIONS

I. **Background**

A. **The '586 Patent**

Plaintiff brought this action for patent infringement, alleging that defendant is infringing upon its interest in United States Patent No. 6,432,586 (the "'586 patent"). The patent relates to "separators" used in the construction of high energy rechargeable lithium-ion batteries. Compl. ¶ 7, ECF No. 1; '586 Patent Abstract 1, ECF No. 1-A. These separators are designed to address

1

"dendrite growth" in lithium batteries, a common problem associated with the high energy anodes used in such high energy batteries. Abstract 1:20-22. Dendrite growth penetrates the separator, creating direct contact between the anode and cathode within each cell of the battery, thereby causing "electronic" shorting of the battery. Abstract 1:22-31. A minimal amount of shorting may only reduce the efficiency of the battery; however, electronic shorting can also cause a phenomenon known as "thermal runaway" of the battery, a serious safety problem for rechargeable lithium batteries. Id. at 1:33-35. According to the Patent Abstract, the dendrite growth limits the commercial application of lithium-ion batteries. Id. at 1:36-39.

The instant invention contemplates a separator designed to address these problems. Id. at 1:45-51. A ceramic composite layer is designed to block dendrite growth and prevent direct contact between the anode and cathode, and a polymeric micro-porous layer is designed to address "thermal runaway" in the event of contact between the anode and cathode. Id. at 2:52-60. A battery with such a separator is less likely to fail, catch fire, or experience a short, and is more likely to last longer. Pl. Mem. in Supp. Prel. Inj. 4, ECF No. 16. Celgard filed a patent application for the invention on April 10, 2000, and the Patent Office issued the patent on April 13, 2002.

### B. Alleged Infringement

Plaintiff brings two claims against Defendants: direct and induced infringement of the '586 Patent in violation of 35 U.S.C. § 271(a)-(b). The Complaint generally alleges that Defendants obtains, either from a third-party manufacturer or through its own production, "uncoated polymeric base films" to which it applies a ceramic coating layer to create battery separators that fall within the scope of the '586 Patent. Compl. ¶ 10-12. The separators are then either sold to third parties or are used in Defendants' own production of lithium-ion batteries, all

allegedly in violation of the '586 Patent. Id. at 13. According to the Complaint, batteries containing the infringing separator—whether manufactured by Defendants or a third-party—are used in various consumer electronic devices such as laptops and tablets, and are also used in electric vehicles. Id. at ¶ 19.

### C. Factual Setting of this Dispute

In contrast to the typical patent litigation in which the parties produce the same or similar product, compete for the same customers, and have little or no prior relationship with the opposition, the parties in this case have been involved with each other in the production of lithium ion batteries since 2005. According to the Complaint and accompanying affidavits, beginning in 2005 and continuing through 2008, Celgard supplied LGC, on an as-needed purchase order basis, with uncoated base films to be used in the production of lithium-ion batteries for consumer-electronic products. In 2008, at LGC's request, the relationship significantly expanded as the parties entered into discussions regarding the prospect of Celgard becoming LGC's exclusive supplier of base film for lithium-ion batteries to be used in electric vehicles ("EVs").

As the parties began negotiating the terms of a Long Term Supply Agreement ("LTA") that would solidify their new relationship, LGC notified Celgard that it would need to increase its production capacity to satisfy LGC's supply demands. Pulwer Decl. ¶ 8, ECF No. 18. Negotiating the terms of the LTA for Celgard was its Vice President and General Manager Mitch Pulwer. Id. at ¶ 1. During these negotiations, Jai Ham, a Vice President of LGC, explained to Pulwer that if Celgard "demonstrated its commitment" to LGC and their new relationship by expanding its production capacity, LGC would enter into the LTA, with Celgard becoming the exclusive supplier of base film in its EV program. Id. at ¶ 9. In reliance on this representation

and in order to meet LGC's supply demands, Celgard began a five-phase expansion project including an expansion to its Charlotte, North Carolina, facility and the construction of a new facility in Concord, North Carolina, costing in excess of $300,000,000. Id. at ¶ 9.

Despite Celgard's expansion, the parties were unable to reach an agreement on the LTA. According to Celgard, LGC continuously rejected terms to which the parties had previously agreed, made counterproposals that included only minor changes, and requested changes that included terms that it had rejected during previous rounds of negotiations. Id. at ¶ 11. The parties were able to agree to a Memorandum of Understanding ("MOU") as a precursor to an LTA. MOU 1, ECF No. 18-1 ("MOU . . . is made in anticipation of the parties entering into a long-term supply agreement").

Under the MOU the parties agreed to "work together in a collaborative effort" during the Collaborative Period which ran from March 11, 2011, to December 31, 2015. Id. However, the agreement was non-binding and stated that neither party was bound to enter into a subsequent supply agreement. Id. Generally speaking, the MOU includes the following principal terms: (1) that LGC will purchase separator "primarily" from Celgard as long as Celgard is able to supply separator to LGC meeting certain qualifications and "overall program objectives which includes price competitiveness, in the quantity needed"; (2) that "LGC intends to purchase the majority of separator required for each application in which Celgard is qualified as long as the Celgard separator" meets the above conditions; and (3) that LGC will give "priority" to Celgard separator in any new application for the electric drive vehicle ("EDV") and energy storage system ("ESS") markets. Id.

Following the execution of the MOU in 2011, the parties' relationship began to sour over price and quantity disputes. According to Celgard, between 2009 and July 2013, LGC purchased

all its base film requirements for the EV industry from Celgard. In November of 2012, LGC demanded that Celgard significantly reduce its prices and threatened to use other base film suppliers should Celgard refuse. Pulwer Decl. ¶ 19. Believing the LGC's price demands were contrary to past negotiations and course of dealings, Celgard refused to lower its prices. After that, the parties' relationship spiraled downward. In June 2013, LGC gave notice that Celgard was being phased out of the EV program beginning in September 2013, with Celgard being completely out by April 2014. Id. at ¶ 25. Celgard filled all outstanding orders but stopped taking additional purchase orders. Its final shipment of base film material to LG Chem was in July 2013. Celgard filed this suit in January 2014.

## II. Personal Jurisdiction and Venue

Defendants move to dismiss the Complaint for lack of personal jurisdiction, contending that they lack the minimum contacts necessary to establish personal jurisdiction in the state of North Carolina. LGC is a Korean Company with no offices or personnel in the United States. It contends that it does not manufacture the allegedly infringing batteries within the United States. Instead, the batteries are manufactured in Asia and then sold to customers outside of the State of North Carolina. LGCAI is a Delaware company with headquarters in New Jersey. It contends that it has little involvement in the production of the lithium ion batteries. It further contends that while it is registered to do business in the State of North Carolina, it has no offices or personnel in the state, and "simply does not sell the accused products or conduct the accused business" in the State of North Carolina. Def.'s Mem. 1.

Federal Circuit case law applies in determining whether this Court has personal jurisdiction over an out-of-state accused infringer. Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). Federal courts apply the relevant state statute

5

when determining whether a federal court, sitting in a particular case, has personal jurisdiction over a defendant, even when the cause of action is purely federal. Id. at 1569. Because North Carolina's long-arm statute is co-extensive with federal due process requirements, the jurisdictional inquiry collapses into a single determination of whether this Court's exercise of jurisdiction over Defendants comports with due process. Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676 (1977). "The constitutional touchstone for determining whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum State.'" Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1230-31 (Fed. Cir. 2010) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, (1985) (internal quotation marks omitted)).

Having considered such threshold motions, the Court will allow Celgard's Motion for Jurisdictional Discovery (#58) into whether LGC and LGCAI have established minimum contacts in North Carolina such that the maintenance of a suit in this forum would not "offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 1872, 80 L. Ed. 2d 404 (1984). The Court does not agree with Defendants assertion that by filing this motion Plaintiff has "essentially concede[d]" that it has failed to establish a prima facie case of personal jurisdiction over Defendants. Def.'s Resp., ECF No. 75 at 1. The Court will refer this matter, as well as the Motion to Change Venue, back to the Magistrate Judge for limited discovery and disposition of those motions.

### III. Preliminary Injunction

A preliminary injunction is an extraordinary remedy, the primary function of which is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit. In re

6

Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 525 (4th Cir.2003). A plaintiff seeking a preliminary injunction must give notice to the opposing party under Federal Rule of Civil Procedure 65 and, at the hearing, must establish the following: (1) plaintiff is likely to succeed on the merits; (2) plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in plaintiff's favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 374 (2008); Moore v. Kempthorne, 465 F.Supp.2d 519, 525 (E.D.Va.2006) ("[t]he standard for granting either a TRO or a preliminary injunction is the same").

The most recent test was adopted by the Court of Appeals for the Fourth Circuit in The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir.2009), *vacated on other grounds*, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010)(memorandum opinion), *reissued in pertinent part*, 607 F.3d 355 (4th Cir.2010), *overruling* Blackwelder Furniture Co. v. Selig Mfg. Co., 550 F.2d 189 (4th Cir.1977) (providing a four-pronged balance of the hardships test). The Winter Court emphasized that a plaintiff must demonstrate more than just a "possibility" of irreparable harm and a strong showing of likelihood of success on the merits. Winter, 129 S.Ct. at 375.

### A. Likelihood of Success on the Merits

The court finds that plaintiff is likely to prevail on the merits of its claim. To establish likelihood of success on the merits, plaintiff must show that (1) it will likely prove infringement of one or more claims of the patent and (2) if validity is challenged, that the infringed claims are likely valid. Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1374 (Fed. Cir. 2006). Whether plaintiff has made an adequate showing is viewed by considering "presumptions and burdens that will inhere at trial on the merits." Id. If the court ultimately finds that defendants likely

infringe on <u>any</u> claim of the patent, this factor must be weighed in favor of plaintiff. Having reviewed description of the claims detailed the claim charts, it appears likely that the SRS sold, offered for sale, used, and imported into this country by defendants infringes at least claim 1 of the '586 patent.

Thus, the court finds this factor weighs in favor of preliminary injunctive relief.

### B. Irreparable Harm

While it is clear that plaintiff has already suffered harm, the court has concluded that if the alleged infringing activity were allowed to continue, it is very likely that plaintiff will suffer irreparable harm in the absence of preliminary relief. This harm includes plaintiff losing goodwill, laying off employees, and loss of market share to at least some competitors who appear to be engaged in infringing activity. The court finds that this factor weighs heavily in favor of preliminary injunctive relief.

### C. Balance of the Equities

Defendants' right to source materials from whatever vendor it is confident in and can receive the lowest price is a cornerstone of the free market carries with it substantial weight. On the other hand, the property interest plaintiff has in its patented technology, and protecting that intellectual property from misappropriation, also carries with it substantial weight. Such equitable consideration is further informed by the impact this court's action on the motion will have on either party's ability to compete: without the injunction, plaintiff is likely to be shut out of automotive marketplace; with the injunction, defendants will have to pay slightly more for supplies from plaintiff. The former harm appears to be irreparable, while the latter harm is compensable in that defendants can be reimbursed if plaintiff fails to prevail in this action. The court finds this factor weighs in favor of preliminary injunctive relief.

### D. Public Interest

Finally, the court has considered the public interest. While the public is certainly interested in being able to buy end products at the lowest possible price through a free and robust market, a public market place that contains goods sourced or produced in a manner that trammels on the very intellectual property that has allowed the product to come to market, while perhaps enjoying lower prices in the short term, is harmed in the long run as such activity discourages investment research and development. Here, plaintiff holds a patent for a very important technological development that ultimately benefits consumers by allowing for the delivery of *safe* electric power to mobile devices by reducing the risk of fire posed by dendrite growth. The court need not look far past the headlines in recent years to understand how important such development is in preventing fire.

The imposition such proposed injunction will place on defendants is minimal in protecting the public interest which is not only in low-priced goods, but in protecting the property interests of those who apply resources to solving not only technological problems, but problems that could have great impact on public safety. Put another way, an injunction which ultimately prevents an upstream misappropriator from profiting from its alleged theft of protected technology by limiting the downstream user is not a hardship because it "simply prevents [the misappropriator] from doing that which the law already prohibits." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., No. 1:04CV977, 2007 WL 4262725, at *3 (M.D.N.C. Nov. 30, 2007); Prudential Ins. Co. v. Inlay, 728 F.Supp.2d 1022, 1032 (N.D.Iowa 2010) (noting that balance of harms favors plaintiff where an injunction restricts the defendant's ability "from using information that it appears he should not be able to use at all for the [applicable] period."). The court has no reason to believe that defendants ability to produce

goods will be in any way impacted as it appears that plaintiff is able to provide the products necessary for production.

***

Having carefully considered all four factors, the court finds that the entry of a preliminary injunction is necessary to protect plaintiff from ongoing and irreparable harm during the pendency of this action. Such harm to plaintiff significantly outweighs any harm that defendants may incur as a result of the entry of the injunction. Finally, the Federal Rules of Civil Procedure state that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). The amount of bond is within the discretion of the Court. Maryland Dept. of Human Resources v. U.S. Dept. of Agriculture, 976 F.2d 1462, 1483 (4th Cir.1992). The Court here finds that a bond of $1,000.000.00, is sufficient to cover defendant's costs or damages should it later be determined that defendant was wrongfully enjoined.

## ORDER

**IT IS THEREFORE ORDERED** that plaintiff's Motion for Preliminary Injunction is hereby **GRANTED**, and defendants are preliminarily enjoined from (1) making, using, selling, or offering for sale in the United States, (2) importing into the United States, and (3) activity inducing others in the United States to make, use, sell, or offer for sale in the United States or to import into the United States the following: any battery, separator, or system that uses or constitutes (i) LG Chem's SRS technology, (ii) an infringing ceramic-coated separator, or (iii) any rechargeable lithium-ion battery, cell, pack, module, or other device, vehicle, or product that includes an infringing ceramic-coated separator. Plaintiff shall secure a bond in the face amount

of $1,000,000.00. Upon motion filed by any party, the court will review the impact of such preliminary injunction after a period of 60 days if requested to do so.

**IT IS FURTHER ORDERED** that defendants' Motion to Dismiss for Lack of Personal Jurisdiction (#30) and Motion to Transfer Venue (#71) are REFERRED to the Magistrate Judge for consideration after jurisdictional discovery, and plaintiff's Motion for Jurisdictional Discovery (#58) is ALLOWED and jurisdictional discovered is opened for a period of 60 days, which shall also be directed by the magistrate judge.

Signed: July 17, 2014

Max O. Cogburn Jr.
United States District Judge