UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00043-MOC-DCK

| | | |
|---|---|---|
| **CELGARD, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **LG CHEM, LTD., and** | ) | |
| **LG CHEM AMERICA, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on Plaintiff's "Objections to Magistrate Judge's

Order Granting Defendants' Alternative Motion to Transfer Venue" (Document No. 266), the

associated response (Document No. 269), and the supplemental briefs allowed by the court

(Document Nos. 275-1; 278). The court heard oral argument on the objections on April 8, 2015.

Also before the court are Defendants' "Motion To Dismiss Counts III, IV, V, VI of Celgard's

First Amended Complaint…" (Document No. 222), Defendants' "Motion To Dismiss Plaintiff's

First Amended Complaint For Lack Of Personal Jurisdiction" (Document No. 226), and the

associated briefs. Having considered the briefs, the oral arguments of counsel as to the

objections, the Magistrate Judge's Order, and the record in this matter, the court enters the

following Order.

## I.    INTRODUCTION

Celgard, LLC ("Plaintiff" or "Celgard") initiated this patent infringement action on January

30, 2014, asserting claims against LG Chem, Ltd. ("LGC") and LG Chem America, Inc.

("LGCAI") (together "LG Chem" or "Defendants") for: (1) direct infringement of U.S. Patent

No. 6,432,586; and (2) induced infringement of U.S. Patent No. 6,432,586. (Document No. 1, pp.10-12). The underlying patent, U.S. Patent No. 6,432,586 (the "'586 patent"), is titled "Separator for a High Energy Rechargeable Lithium Battery," and relates to "separators" used in the construction of high energy rechargeable lithium-ion batteries. <u>See</u> (Document No. 1, ¶ 7); (Document No. 1-A, p.1). Put simply, this technology reduces the likelihood that a battery will fail, catch fire, or experience a short. <u>See</u> (Document Nos. 16, p.4; 1-A, p.1).

Plaintiff's Amended Complaint generally alleges that LG Chem obtains uncoated polymeric base films from third parties, to which it applies a ceramic coating layer to create battery separators that fall within the scope of the '586 Patent. (Document No. 217, ¶ 51). The separators are then sold by LGC and/or LGCAI to third parties, or used in Defendants' own production of lithium-ion batteries, all allegedly in violation of the '586 Patent. <u>Id.</u> at ¶¶106-09. Plaintiff alleges that batteries containing infringing separators manufactured by Defendants are used in various consumer electronic devices and electric vehicles that are sold throughout the United States, including North Carolina. <u>Id.</u> at ¶¶16, 52-53, 106.

## A.  Factual Background and Relationship Of The Parties

As previously discussed by this court, <u>see</u> (Document No. 128), the factual setting of this patent dispute is somewhat unique and, as it relates to the contested issue of personal jurisdiction, bears repeating here. In contrast to the typical patent litigation in which the parties produce the same or similar product, compete for the same customers, and have little or no prior relationship with the opposition, the parties in this case have been involved with each other in the production of lithium ion batteries since 2005. Beginning in 2006 and continuing through 2008, Celgard supplied LGC, on an as-needed purchase order basis, with uncoated base films to be

used in the production of lithium-ion batteries for consumer-electronic ("CE") products. (Document No. 18, Declaration of Mitchell Pulwer ("Pulwer Decl."), ¶¶ 4-5; Document No. 217, ¶67). In 2008, at LGC's request, the relationship significantly expanded as the parties entered into discussions regarding the prospect of Celgard becoming LGC's exclusive supplier of base film for lithium-ion batteries to be used in electric vehicles ("EVs"). (Pulwer Decl., ¶ 6; Document No. 217, ¶ 17).

As the parties began negotiating the terms of a Long Term Supply Agreement ("LTA") that would solidify their new relationship, LGC notified Celgard that it would need to increase its production capacity to satisfy LGC's supply demands. (Pulwer Decl. ¶ 8). Negotiating the terms of the LTA for Celgard was its Vice President and General Manager Mitch Pulwer. Id. at ¶ 1. During these negotiations, Jai Ham, a Vice President of LGC, explained to Pulwer that if Celgard "demonstrated its commitment" to LGC and their new relationship by expanding its production capacity, LGC would enter into the LTA, with Celgard becoming the exclusive supplier of base film for LGC's EV program. Id. at ¶ 8. Plaintiff states that in reliance on this representation and in order to meet LGC's supply demands, Celgard began a five-phase expansion project including an expansion to its Charlotte, North Carolina facility and the construction of a new facility in Concord, North Carolina, costing in excess of $300,000,000. Id. at ¶ 9; (Document No. 217, ¶ 68-70). LGC stopped purchasing base film for use in CE devices in 2008 in order for Plaintiff to be able to focus exclusively on producing base film for EVs. (Pulwer Decl. ¶ 6).

Despite Celgard's expansion, the parties were unable to reach an agreement on the LTA. According to Celgard, LGC continuously rejected terms to which the parties had previously agreed, made counterproposals that included only minor changes, and requested changes that

included terms that it had rejected during previous rounds of negotiations. <u>Id.</u> at ¶ 11. The parties were able to agree to a Memorandum of Understanding ("MOU") as a precursor to an LTA. <u>Id.</u> at ¶13; MOU (Document No. 18-1), p.2 ("LGC and Celgard understand that this is a non-binding MOU and is made in anticipation of the parties entering into a long-term supply agreement").

Under the MOU, the parties agreed to "work together in a collaborative effort" during the "Collaboration Period," which ran from March 11, 2011, to December 31, 2015. <u>Id.</u> at p. 2-3. However, the agreement was non-binding and stated that neither party was bound to enter into a subsequent supply agreement. <u>Id.</u> Generally speaking, the MOU includes the following principal terms: (1) that LGC will purchase separators[1] "primarily" from Celgard as long as Celgard is able to supply separators to LGC meeting certain qualifications and "overall program objectives which includes price competitiveness, in the quantity needed"; (2) that "LGC intends to purchase the majority of separator required for each application in which Celgard is qualified as long as the Celgard separator" meets the above conditions; and (3) that LGC will give "priority" to Celgard separators in any new application for the electric drive vehicle ("EDV") and energy storage system ("ESS") markets. <u>Id.</u>

Following the execution of the MOU in 2011, the parties' relationship began to sour over price and quantity disputes. According to Celgard, between 2009 and July 2013, LGC purchased substantially all of its base film requirements for the EV industry from Celgard. (Pulwer Decl., ¶ 19). In November of 2012, LGC demanded that Celgard significantly reduce its prices and threatened to use other base film suppliers should Celgard refuse. <u>Id.</u> at ¶ 21. Believing that

---

[1] The MOU refers to LGC's purchase of "separators" from Celgard, but affidavits filed by both parties makes clear that the "separators" referred to in the MOU are equivalent to "base film," as the term is used in this Order. <u>See generally</u> Pulwer Decl.; Declaration of Jina Lee (Document No. 52).

LGC's price demands were contrary to past negotiations and course of dealings, Celgard refused to lower its prices. Id. at ¶ 23. After that, the parties' relationship spiraled downward. In June 2013, LGC gave notice that Celgard was being phased out of the EV program beginning in September 2013, with Celgard being completely out by April 2014. Id. at ¶ 25. Celgard filled all outstanding orders but stopped taking additional purchase orders from LGC. Id. at ¶ 26. Its final shipment of base film material to LGC was in July 2013. (Document No. 80 ("Paulus Decl."), ¶ 7). Celgard filed this suit in January 2014, bringing the above-mentioned claims for patent infringement.

### B.  Procedural History

Approximately one month after filing the original complaint in this matter, on March 5, 2014, Plaintiff filed a "Motion For Preliminary Injunction." (Document No. 15). On March 19, 2014, Defendants filed a "Motion To Dismiss Plaintiff's Complaint For Lack Of Personal Jurisdiction" (Document No. 30). On April 7, 2014, Plaintiff filed an "Alternative Motion For Jurisdictional Discovery." (Document No. 58). On April 23, 2014, Defendants filed an "Alternative Motion To Transfer Venue To The Eastern District Of Michigan." (Document No. 71). On May 14, 2014, the undersigned held a hearing on the aforementioned motions, during which the court primarily considered arguments on the issues of personal jurisdiction and a preliminary injunction.

The undersigned issued an "Order" (Document No. 128) on July 18, 2014, granting Plaintiff's "Motion For Preliminary Injunction" (Document No. 15) and Plaintiff's "Alternative Motion For Jurisdictional Discovery" (Document No. 58), and directing that "The LG Chem Defendants' Motion To Dismiss Plaintiff's Complaint For Lack Of Personal Jurisdiction"

(Document No. 30) and "The LG Chem Defendants' Alternative Motion To Transfer Venue To The Eastern District Of Michigan" (Document No. 71) be referred to Magistrate Judge Keesler for consideration after jurisdictional discovery. The Order also discussed the factual setting, the history of the parties' business transactions, the relationship of the parties to North Carolina, and the appropriateness of jurisdictional discovery. (Document No. 128, at p.2-6). Judge Keesler issued an "Order" (Document No. 139) on July 21, 2014, setting limits and deadlines for jurisdictional discovery. Also on July 21, 2014, Defendants filed a "Notice of Appeal" as to the Order granting the Preliminary Injunction. (Document No. 150). On July 22, 2014, the undersigned issued an Order, (Document No. 160), granting Defendants' "Motion to Stay Preliminary Injunction Pending Appeal." On August 13, 2014, the undersigned entered an Order, (Document No. 188), denying Plaintiff's Motion for Reconsideration of the Order Granting LG Chem's Motion to Stay. (Document No. 165). On August 15, 2014, Plaintiff filed a "Notice of Appeal" (Document No. 191) as to the Order granting Defendants' Motion to Stay, and from the Order denying Plaintiff's Motion for Reconsideration. Both appeals are currently before the Court of Appeals for the Federal Circuit. See Celgard, LLC v. LG Chem, Ltd., No. 14-01675, (Fed. Cir. 2014).

On August 26, 2014, Judge Keesler issued an "Order And Memorandum And Recommendation" (Document No. 204) allowing Plaintiff to file an Amended Complaint incorporating the results of jurisdictional discovery, and recommending that the pending motions to dismiss and transfer (Document Nos. 30 and 71) be denied as moot.

Plaintiff filed its "First Amended Complaint" (Document No. 217) on September 5, 2014. The Amended Complaint re-asserts claims for direct infringement and induced infringement of

the '586 Patent by both Defendants. Plaintiff alleges that after the parties' business relationship went sour, "Defendants walked away from their prior commitments and chose to purchase, coat and sell infringing ceramic coated separator with base film from other suppliers, despite their knowledge that these actions infringed on Celgard's exclusive patent rights." (Document No. 217, ¶ 1). The Amended Complaint also adds claims against LGC (only) for: unfair and deceptive trade practices; breach of contract; breach of the implied covenant of good faith and fair dealing; and, in the alternative, unjust enrichment. Id. at ¶¶ 115-143. The new claims against LGC relate to Plaintiff's role as a supplier of separator base film for lithium-ion batteries manufactured by LGC for EVs. Id. at ¶ 1. Plaintiff's additional counts contend that LGC is liable for its "repeated false promises to use Celgard as its exclusive and/or primary long-term supplier of base film for the electric vehicle industry." Id. ¶ 116.

On September 29, 2014, Defendants filed: (1) "Motion To Dismiss Counts III, IV, V, VI, Celgard's First Amended Complaint…" (Document No. 222); (2) "Motion To Dismiss Plaintiff's First Amended Complaint For Lack Of Personal Jurisdiction" (Document No. 226); and (3) "Alternative Motion To Transfer Venue To The Eastern District Of Michigan In Whole Or In Part." (Document No. 230). On February 18, 2015, Judge Keesler issued an Order (Document No. 262) granting Defendants' "Alternative Motion to Transfer." In this Order, Judge Keesler declined to address the merits of, or make any recommendations regarding, the two Motions to Dismiss. In doing so, Judge Keesler cited, among other authority, BSN Medical, Inc. v. American Medical Products, LLC, 3:11cv092-GCM-DSC, 2012 WL 171269, at *2 (W.D.N.C. Jan. 20, 2012), wherein another magistrate judge in this district granted an alternative motion to transfer without reaching the merits of the motion to dismiss. Plaintiff has timely objected to

Judge Keesler's Order pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P 72(a). Defendants have responded to such objections and the matter is now ripe for review.

## II.  ALTERNATIVE MOTION TO TRANSFER

### A.  Standard of Review

When a magistrate judge issues an order on a non-dispositive matter, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). See also 28 U.S.C. § 636(B)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."). In engaging in such review, a finding is "'clearly erroneous' when, although there is evidence to support it, the reviewing court ... is left with the definite and firm conviction that a mistake has been committed." High Voltage Beverages, L.L.C. v. Coca-Cola Co., No. 3:08-CV-367, 2010 WL 2342458, at *1 (W.D.N.C. June 8, 2010) (citing Walton v. Johnson, 440 F.3d 160, 173–74 (4th Cir. 2006)).  A magistrate judge's order is "contrary to law" where he "failed to apply or misapplied statutes, case law, or procedural rules." Id. (citing Miceli v. KBRG of Statesville, L.L.C., No. 5:05–CV–265–V, 2008 WL 2945451, at *1 (W.D.N.C. July 24, 2008)).

### B.  Discussion of Plaintiff's Objections

#### 1.  *Standing Order Regarding Magistrate Judge Referrals*

This court's "Standing Order" regarding referrals to Magistrate Judges in this District, No. 3:11-mc-25-MOC (W.D.N.C., Mar. 16, 2011) provides, in relevant part:

> pursuant to 28, United States Code, Section 636(b) and Local Civil Rule 72.1, in civil and miscellaneous cases, magistrate judges shall be specifically referred the following duties:
> …

to dispose of non-dispositive civil motions, including but not limited to motions for ...transfer to another division or district…Where a non-dispositive motion is pled in the alternative to a dispositive motion, a Memorandum and Recommendation will be entered as to both motions.

Id. Plaintiff's first objection centers on the argument that because Judge Keesler issued an order on a non-dispositive motion (to transfer) without addressing the merits of the two dispositive motions (to dismiss) through a Memorandum and Recommendation, Judge Keesler violated this Court's Standing Order and thus is contrary to law. Plaintiff argues that the proper remedy for this error is to require Judge Keesler to issue a Memorandum and Recommendation for each of the dispositive motions, as well as the non-dispositive alternative motion.

As discussed at the hearing, the undersigned regards the Standing Order as an in-house policy for chambers to follow in an attempt to efficiently resolve the merits of motions and move the docket along. While the court always finds it helpful to have recommendations on legal issues from the magistrate judges of this district, a magistrate judge's failure to comply with the procedures of the Standing Order does not constitute grounds for overturning his decision. The court will therefore overrule Plaintiff's objection as to Judge Keesler's non-compliance with the Standing Order.

The court finds in this situation, however, that the merits of the dispositive motions have a significant bearing on the resolution of the alternative motion to transfer. In light of the fact that the uncertainty of the jurisdictional issue was a significant reason for Judge Keesler's Order transferring venue, see (Document No. 262, pp.7-9), the court finds that the proper course of action here would have been to address the issue of personal jurisdiction (raised in the dispositive Motion to Dismiss for Lack of Jurisdiction) simultaneously with the issue of transfer.

The court will therefore address both of the dispositive motions along with the objections to the Order transferring venue.

### 2. *Transfer of Venue*

      i.    <u>Legal Standards</u>

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." <u>Id.</u> 28 U.S.C. § 1400(b), which specifically governs venue in patent actions, provides, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." <u>Id.</u> A motion to transfer pursuant to § 1404(a) in a patent case requires application of the law of the regional circuit. <u>In re Link_A_Media Devices Corp.</u>, 662 F.3d 1221, 1222-23 (Fed. Cir. 2011).

Upon a motion to transfer, the moving party carries a heavy burden. <u>Duke Energy Florida, Inc. v. Westinghouse Elec. Co.</u>, No. 3:14-CV-00141-MOC, 2014 WL 2572960, at *5 (W.D.N.C. June 9, 2014) (citing <u>Datasouth Computer Corp. v. Three Dimensional Technologies, Inc.</u>, 719 F.Supp. 446, 451 (W.D.N.C. 1989)). A court's decision to grant a motion to transfer venue under 28 U.S.C. § 1404(a) is largely discretionary. <u>3A Composites USA, Inc. v. United Indus., Inc.</u>, No. 5:13CV83-RLV, 2014 WL 1471075, at *1 (W.D.N.C. Apr. 15, 2014) (citing <u>Landers v. Dawson Const. Plant Ltd.</u>, 201 F.3d 436, 1999 WL 991419, *2 (4th Cir. 1999)). In exercising such discretion, the court applies a balancing test and considers various factors in deciding whether transfer is appropriate. <u>Jim Crockett Promotions, Inc. v. Action Media Grp.</u>,

Inc., 751 F.Supp. 93 (W.D.N.C. 1990). The factors to be considered include:

1. The plaintiff's initial choice of forum;

2. The residence of the parties;

3. The relative ease of access of proof;

4. The availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses;

5. The possibility of a view by the jury;

6. The enforceability of a judgment, if obtained;

7. The relative advantages and obstacles to a fair trial;

8. Other practical problems that make a trial easy, expeditious, and inexpensive;

9. The administrative difficulties of court congestion;

10. The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with state law that must govern the action; and

11. The avoidance of unnecessary problems with conflict of laws.

Id. "The above factors fall into three categories: (1) factors that favor neither party, (2) factors that favor Defendant, and (3) factors that favor Plaintiff." Cohen v. ZL Technologies, Inc., No. 3:14-CV-00377-FDW, 2015 WL 93732, at *2 (W.D.N.C. Jan. 7, 2015) (citing Crockett, 751 F. Supp. at 98). The court must analyze the eleven factors based on quality, not just quantity. Id. (citing Crockett, 751 F. Supp. at 96). In most cases, the plaintiff's choice of forum should be given significant weight, and should not be disturbed unless the balance is strongly in favor of transfer. Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). A motion should not be granted if transfer "would merely shift the inconvenience from the defendant to the plaintiff, or if the equities lean but slightly in favor of the movant after all factors are considered." Jim Crockett Promotions, Inc. v. Action Media Grp., Inc., 751 F. Supp. 93, 95 (W.D.N.C. 1990).

On a motion to transfer, the facts as alleged in the complaint are accepted as true and all

reasonable inferences are drawn in the plaintiff's favor. <u>Century Furniture, LLC v. C & C Imps.,</u> <u>Inc.</u>, No. 1:07cv179, 2007 WL 2712955, at *2 (W.D.N.C. Sept. 14, 2007).

As noted by Judge Keesler, "While a court typically decides the question of personal jurisdiction over a defendant before considering venue, the Supreme Court has held that 'when there is a sound prudential justification for doing so, ... a court may reverse the normal order of considering personal jurisdiction and venue.'" <u>BSN Medical, Inc. v. American Medical Products</u>, LLC, 3:11cv092-GCM-DSC, 2012 WL 171269, at *2 (W.D.N.C. Jan. 20, 2012) (citing <u>Leroy v.</u> <u>Great W. United Corp.</u>, 443 U.S. 173, 180 (1979)). "A court need not have personal jurisdiction over a defendant to transfer a case pursuant to 28 U.S.C. §§ 1404(a) or 1406(a)." <u>Id.</u>

       ii.     <u>The Magistrate Judge's Order</u>

Judge Keesler found good cause to allow Defendants' motion to transfer to the Eastern District of Michigan and, citing <u>BSN Medical</u>, declined to make any recommendation as to the pending dispositive motions, including the motion pertaining to personal jurisdiction. Judge Keesler found that the question of personal jurisdiction over Defendants in North Carolina presented a "close call upon which reasonable minds could differ," and that the issue remained uncertain even after a round of briefing, oral arguments, and a jurisdictional discovery period prior to the filing of an Amended Complaint and renewed motions. (Document No. 262, p. 7). Judge Keesler also noted that this court recently rejected many of the same jurisdictional arguments that Plaintiff made in this case in a different patent infringement lawsuit filed by Plaintiff against a different defendant. <u>See</u> (Document No. 262, p. 7) (citing <u>Celgard, LLC v. SK</u> <u>Innovation, Co., Ltd.</u>, 3:13cv254-MOC-DSC, 2014 WL 5430993 (W.D.N.C. Aug. 29, 2014)). He noted that he found it doubtful that this court has personal jurisdiction over both Defendants with

regard to all the claims asserted against them, but that Defendants admit to jurisdiction in Michigan.[2] Id.

In making the decision to grant transfer in light of what he found to be "doubtful" jurisdiction over both Defendants in North Carolina and Defendants' concessions that they are subject to jurisdiction in Michigan, Judge Keesler cited several decisions from district courts in this circuit doing the same. See (Document No. 262, pp.8-9 (citing La Casa Real Estate & Inv., LLC v. KB Home of S.C., Inc., No. 1:09CV895, 2010 WL 2649867, at *2 (M.D.N.C. June 30, 2010) ("in the interests of convenience, fairness and judicial economy, the Court elects to consider Defendant's Motion to Transfer pursuant to 28 U.S.C. § 1404(a) before reaching any issues related to the Court's jurisdiction."); Nacco Materials Handling Grp., Inc. v. Lilly Co., 2011 WL 2119097, at *4 (E.D.N.C. May 25, 2011) (granting motion to transfer when personal jurisdiction over defendant remained "in serious doubt"); Waldron v. Atradius Collections, Inc., 2010 WL 2367392, at *3 (D.Md. June 9, 2010) ("[T]he constitutional question of personal jurisdiction is a close one upon which reasonable minds could differ. There is no reason to inject such a question into the case unnecessarily."); Jenkins v. Albuquerque Lonestar Freightliner, LLC, 464 F. Supp. 2d 491, 494 (E.D.N.C. 2006) (granting motion to transfer in part because "the absence of personal jurisdiction over the defendant" in the original forum but not the transferee forum is an "impediment to a decision on the merits"); Tyler v. Gaines Motor Lines, Inc., 245 F. Supp. 2d 730, 734 (D.Md. 2003) (transferring case in interest of justice because the question of

---

[2] More specifically, LG Chem states that it is subject to specific jurisdiction in the Eastern District of Michigan because it sells the accused lithium-ion batteries to electric vehicle manufacturers residing in the district, including General Motors, Ford Motor Company, and Chrysler. (Def. Mem. Sup. Mot. Transfer (Document No. 231, p. 5); ("Declaration of Jun Hong Min …" ("Min Decl.") ¶ 3, Dkt. 73.) Additionally, all three of LG Chem's U.S. subsidiaries, including LGCAI, have outposts and/or offices in Michigan. (Min Decl. ¶ 2, Dkt. 73).

personal jurisdiction was a "close one" and "would inject into the case an unnecessary legal issue that would render the entire litigation null and void, if, on appeal, jurisdiction were found to be lacking")). While the court agrees that the issue of personal jurisdiction presents a "close call" in this case, it also believes that the parties deserve a thorough analysis of the dispositive question of personal jurisdiction before this matter is transferred to another district.

### iii. Review of Crockett Analysis

Plaintiff argues that Judge Keesler's Order should be set aside as clearly erroneous and contrary to law based on his analysis of the Crockett factors. Judge Keesler found that five factors—residence of the parties, access to proof, attendance of witnesses, fair trial, and practical problems affecting trial expediency and efficiency—weighed in favor of transfer, while the remaining factors were neutral. (Document No. 262, pp.9-14). Plaintiff argues that each of these factors, as well as its choice of forum and local resolution factors, weigh against transfer or, at a minimum, are neutral, and that none of the Crockett factors weigh in favor of transfer. Judge Keesler found the following factors to be neutral: the possibility of a view by the jury; the enforceability of a judgment; the relative court congestion between the districts; and the avoidance of conflict of laws. Plaintiff does not challenge the venue order based on these factors and the court will therefore not disturb Judge Keesler's determinations on those factors.

The court is mindful of the discretion to the magistrate judge in analyzing a motion to transfer, 3A Composites USA, Inc. v. United Indus., Inc., No. 5:13CV83-RLV, 2014 WL 1471075, at *1 (W.D.N.C. Apr. 15, 2014), and will only disturb his decision where clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(B)(1)(A). The court will address the objections in turn.

*a. Plaintiff's choice of forum*

Judge Keesler found this factor to be neutral; Plaintiff objects to such a finding, arguing that its choice of forum should have weighed more strongly in its favor. Judge Keesler properly noted that although the choice of forum by the Plaintiff is ordinarily given considerable weight, "that weight is diminished when the conduct giving rise to the complaint did not occur in the forum." See (Document No. 262, p. 9); Hames v. Morton Salt, Inc., 3:11cv570-MOC-DSC, 2012 WL 1247201, at *2 (W.D.N.C. Apr. 13, 2012) (citing Parham v. Weave Corp., 323 F.Supp.2d 670, 674 (M.D.N.C. 2004); Telepharmacy Solutions, Inc. v. Pickpoint Corp., 238 F.Supp.2d 741, 743 (E.D.Va. 2003); Lynch v. Vanderhoef Builders, 237 F.Supp.2d 615, 617 (D.Md. 2002)). Plaintiff argues that the "diminished weight" rule only applies where none or essentially none of the conduct giving rise to the action occurred in the plaintiff's chosen forum. See Parham, 323 F. Supp. 2d at 674 ("While the plaintiff's choice of forum is accorded substantial weight, the deference given to the plaintiff's choice is proportionate to the relation between the forum and the cause of action." (citations and internal quotations omitted)); Speed Trac Technologies, Inc. v. Estes Express Lines, Inc., 567 F. Supp. 2d 799, 803 (M.D.N.C. 2008) (noting that choice of forum "receives less weight…when (1) the plaintiff chooses a foreign forum, or (2) the cause of action bears little or no relation to the chosen forum.").

Judge Keesler found that while Plaintiff had noted some contacts with North Carolina by Defendant LGC, most of the conduct giving rise to the crux of the amended complaint (the patent infringement claims) as to both Defendants occurred in Korea or Michigan. (Document No. 262, p.10). Judge Keesler thus applied the "diminished weight" rule upon finding that most of the conduct giving rise to the complaint did not occur in North Carolina. However, as

explained above, Plaintiff has alleged, and this court can reasonably infer, that much of the conduct giving rise to Defendants' claims did occur in North Carolina. Plaintiff's Amended Complaint alleges that at least some conduct giving rise to the alleged patent infringement occurred in North Carolina, (Document No. 217, ¶ ¶ 10-17), and that all of the conduct forming the basis of its state law claims occurred in North Carolina. See, e.g. id. at ¶ ¶ 17-32, 80-82, 101. As alleged in the Amended Complaint, Plaintiff argues that the alleged infringement in this case occurred as a result of the longstanding business relationship of the parties concerning sales of Celgard base film and the ultimate breakdown of such relationship. See (Document No. 217, ¶ ¶ 18; 26-28; 49-51). The crux of Plaintiff's argument is that it provided base film to LGC specifically for its use and that when the business relationship went sour, LGC sourced base film from third parties but continued to use Celgard's patented technology without Celgard's permission, which constitutes infringement of the '586 patent. Id. See also Pl. Opp. Mot. Transfer (Document No. 243, p. 7) ("Celgard provided LG Chem separator material that Celgard permitted to be ceramic coated pursuant to the patent-in-suit, and the breakdown of this relationship—caused by LG Chem's misconduct—led LG Chem to manufacture and distribute products containing unauthorized separator material, thereby infringing the patent-in-suit.").

Here, while not all of the conduct giving rise to the claims asserted against Defendants occurred in North Carolina, much of it did. See Section IV, C. Accordingly, the court finds that it was error for the magistrate judge to apply the "diminished weight" rule and that the general rule that the plaintiff's choice of forum should be accorded substantial weight is applicable. Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984). As such, the court finds that the Plaintiff's choice of forum weighs in favor of keeping this action in this district.

### b. Residence of the parties

Judge Keesler found that this factor slightly favors transfer; Plaintiff objects, arguing that because neither party is a resident of Michigan, this factor should have weighed against transfer or been neutral. Plaintiff is a resident of North Carolina. LGC is a corporation with its principal place of business in Seoul, Korea. LGCAI's principal place of business is in New Jersey. Judge Keesler found that because all LGC subsidiaries have outposts in the Eastern District of Michigan, and Defendants contend they are "at home" in Michigan, this factor weighs in favor of transfer.

For purposes of venue, "a corporate defendant resides in any judicial district in which it is subject to personal jurisdiction at the time the action commences." 28 U.S.C. § 1391(c). See also VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1584 (Fed.Cir.1990) (holding that the language of § 1391(c) applies to § 1400(b)); Trintec Indus., Inc. v. Pedre Promotional Products, Inc., 395 F.3d 1275, 1280 (Fed. Cir. 2005) ("Venue in a patent action against a corporate defendant exists wherever there is personal jurisdiction.").

Even assuming jurisdiction is proper over both Defendants in Michigan and that they are "residents" within the meaning of the applicable statutes, the disparity in the residencies between Plaintiff and Defendants would make this factor neutral. See Simpson v. Snyder's of Hanover, Inc., No. 1:05-CV-354, 2006 WL 1642227, at *5 (W.D.N.C. June 12, 2006) (affirming magistrate judge's determination that the residence factor was neutral because one party was a resident of the forum and one party was a resident of the proposed venue); Tracy v. Loram Maint. of Way, Inc., No. 5:10-CV-102-RLV, 2011 WL 2791257, at *6 (W.D.N.C. July 14, 2011) ("the Court finds that the residency of the parties is a neutral factor. Plaintiff resides in Catawba

County, North Carolina, while Defendant's main place of business is in Minnesota. Regardless of the place of adjudication, one party will benefit to the other's detriment.").

The court finds it was error for the Magistrate Judge to find that residence of the parties favored transfer and finds this factor is, in fact, neutral.

### c. Access to evidence

Judge Keesler found that this factor favors transfer; Plaintiff objects and argues that it should have been, at a minimum, neutral. "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." In re Genentech, Inc., 566 F.3d 1338, 1345 (Fed. Cir. 2009) (citation omitted). Here, Plaintiffs allege that much of the proof in this case is in North Carolina, including "relevant documents, contracts, and e-mails." (Document No. 243, p.5). Defendants allege that the bulk of the evidence is likely to come from LGC and its U.S. subsidiaries involved in the lithium battery business and located in Michigan. (Document No. 248, p.2). Even accepting such argument as true for the patent infringement claims (despite the fact that neither Defendant is headquartered in Michigan), the same cannot be said for all of the state law claims. As such, the court cannot find that the "bulk" of the evidence would be in Michigan, when the documents related to the conduct giving rise to Plaintiff's claims are likely at each party's headquarters—in Korea, New Jersey, and North Carolina. See MGT Gaming, Inc. v. WMS Gaming, Inc., 978 F. Supp. 2d 647, 669 (S.D. Miss. 2013) ("Presumably, the bulk of the discovery material relating to a corporate party is located at the corporate headquarters.")(citing In re Acer Am. Corp., 626 F.3d 1252, 1256 (Fed. Cir. 2010)). The court finds that the magistrate judge erred in finding that this factor favored transfer

and finds that given the nature of the claims and the relevant evidence, this factor is neutral.

> ### d. *Availability of compulsory process for witnesses and the costs of transporting and obtaining those witnesses*

Judge Keesler found that this factor favors transfer; Plaintiff objects. As the parties note, "[t]he convenience of witnesses, particularly nonparty witnesses important to the resolution of the case, is often cited as the most significant factor in ruling on a motion to transfer … One strong argument against transfer is that the original forum will be the most convenient for the witnesses. And when transfer will better serve the convenience of the witnesses, the motion under Section 1404(a) is more likely to be granted." 15 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3851 (4th ed.) (collecting cases).

Here, Plaintiff has identified two witnesses in North Carolina (Document No. 243, pp.5-6); Defendants have not identified any witnesses. <u>See</u> Def. Reply (Document No. 248, p.3) (stating that "LG Chem's potential witnesses are <u>likely</u> numerous…and none of these potential witnesses are located in North Carolina. In part because of LGCAI's presence in Michigan, witness attendance of both Defendants is far easier in Michigan.") (emphasis added). Judge Keesler found that the facts on this factor are not as developed as he would have hoped, but that to the extent that non-party witnesses existed in this matter (i.e. customers or manufacturers of products that include the allegedly infringing separators), they were more likely to be made available in Michigan. (Document No. 262, p.11-12). While the court understands the magistrate judge's logic, it simply cannot agree that this factor favors transfer where Defendant has not identified a single witness, let alone one in Michigan. <u>See</u> <u>Capital One Fin. Corp. v. Drive Fin. Servs., L.P.</u>, 434 F. Supp. 2d 367, 375-76 (E.D. Va. 2006) ("The party asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting

the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience."); 15 Fed. Prac. & Proc. Juris. § 3851 ("The party seeking the transfer must identify, typically by affidavit, the key witnesses to be called, state their residence, and provide at least a general summary of what their testimony will cover."). The court therefore finds that Judge Keesler's decision on this factor was in error. The court will therefore construe this factor as neutral.

*e. Relative advantages and obstacles to a fair trial*

Judge Keesler found that this factor slighted favored transfer; Plaintiff objects. In explaining his determination on this factor, Judge Keesler again discussed availability of witnesses as a consideration. (Document No. 262, pp. 12-13). Plaintiff argues that Judge Keesler erroneously "double counted" the witness availability and that he should have considered the "home field advantage" or bias of a trial in Michigan, where Defendants allegedly have the support of large auto-makers. While this court finds no basis for disturbing Judge Keesler's on the issue of "double counting," and agrees with his determination that there is no basis for any clear advantages or obstacles to fair trial in either district, it does find that his reliance on the presence and availability of unidentified witnesses in Michigan was in error. As explained above, the court finds that as Defendants have not identified any witnesses in the state of Michigan, there is no basis for assuming that the presence of such witnesses will offer any advantages to a fair trial. Regarding Plaintiff's arguments as to Defendants' "home field" advantage in Michigan, the argument as to such advantages goes both ways. See Rice v. Bellsouth Adver. & Pub. Corp., 240 F. Supp. 2d 526, 530 (W.D.N.C. 2002). The court therefore finds that this factor is neutral.

##### f.    Practical issues affecting trial expediency and efficiency

Judge Keesler found that this factor slightly favored transfer; Plaintiff objects. Judge Keesler noted that no trial is ever easy, expeditious or inexpensive, and that all trials involve air travel and inconvenience. (Document No. 262, p.13) (citing <u>Century Furniture, LLC v. C & C Imps., Inc.</u>, No. 1:07cv179, 2007 WL 2712955, at *5 (W.D.N.C. Sept. 14, 2007)). He further stated that after balancing all evidence to date, this factor slightly favored transfer. The court finds that without more evidence to the contrary, this factor clearly does not favor transfer. In <u>Century</u>, wherein the plaintiff brought suit in the Asheville division of this district, the court noted that, "the practical problem is access to the situs of the litigation via air transportation, and the mountains of North Carolina simply are not *easily* accessible when engaged in transcontinental litigation." <u>Id.</u> Here, litigation in this district will occur in Charlotte, North Carolina, a city with an international airport that is easily accessible by all parties. Indeed, the court notes that three representatives from Defendants' office in Korea were present in Charlotte for the hour-long oral arguments on the objections at issue, and presumably reached the city via airplane. <u>See</u> Hearing Transcript (Document No. 274) at 14:24-15:8. Judge Keesler noted in his order that "travel from Korea or New Jersey to North Carolina or Michigan are roughly equivalent." (Document No. 262, p.12). In light of the fact that motions to transfer are not to be granted merely to shift the inconvenience from one party to another, <u>Jim Crockett Promotions, Inc. v. Action Media Grp., Inc.</u>, 751 F. Supp. 93, 95 (W.D.N.C. 1990), and that Judge Keesler appears to have based his determination solely on the inconvenience caused by air travel, the court finds that his determination that this factor weighed in favor of transfer was clearly erroneous. <u>See</u> <u>Rice v. Bellsouth Adver. & Pub. Corp.</u>, 240 F. Supp. 2d 526, 530 (W.D.N.C.

2002) ("In either forum, there will be practical problems such as travel and accommodations for the parties and their counsel. This factor is neutral."). The court therefore finds this factor to be neutral.

> g. *Interest of resolving localized controversies at home and the appropriateness of having the trial of a diversity case in a forum that is at home with the state law that must govern the action*

Judge Keesler found this factor to be neutral; Plaintiff objects. On this factor, Judge Keesler found that, particularly with the aid of very able counsel, any district court would be able to apply the laws of North Carolina to the extent necessary, in addition to patent laws. He noted that this case involves claims of national, if not international patent violations. The court finds no error in this determination and overrules Plaintiff's objection that the focus should have been on the "strong interest in resolving issues locally."

## C. Conclusion

In light of the above analysis, the court finds that Judge Keesler clearly erred in weighing several Crockett factors, and that the balance of the factors favors maintaining this action in this district. Put another way, the court finds that transfer of this matter "would merely shift the inconvenience from the defendant to the plaintiff," Jim Crockett Promotions, Inc. v. Action Media Grp., Inc., 751 F. Supp. 93, 95 (W.D.N.C. 1990), which makes transfer inappropriate. Because the court finds that personal jurisdiction over both Defendants is appropriate in this district, see Section IV, and that the balance of factors does not favor transfer, the court will set aside those determinations of the magistrate judge discussed above, and deny Defendants' Alternative Motion to Transfer.

### III.    DEFENDANTS' MOTION TO DISMISS COUNTS III-VI OF AMENDED COMPLAINT

The court now addresses Defendants' Motion to Dismiss Counts III, IV, V, and VI of Plaintiff's Amended Complaint. (Document No. 222). Defendants claim that Plaintiff has failed to properly plead facts sufficient to claim (1) unfair and deceptive trade practices; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; and (4) unjust enrichment, as required by Fed. R. Civ. P. 12(b)(6).

#### A. Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, a claimant must allege facts in his complaint that "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…" Id. (second alteration in original; citation omitted). A claimant must plead sufficient facts to state a claim for relief that is "plausible on its face." Id. at 570. As the Supreme Court elaborated in Ashcroft v. Iqbal, 556 U.S. 662 (2009), "[a] claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." Id.  Thus, a complaint falls short of the plausibility standard where a plaintiff pleads "facts that are 'merely consistent with' a defendant's liability ...."  Id. While the court accepts plausible factual allegations made in a claim as true and considers those facts in the light most favorable to plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore

-23-

Mkt.'s Inc. v. J.D. Assoc.'s, LLP, 213 F. 3d 175, 180 (4th Cir. 2000).

**B. Discussion**

*1. Unfair and Deceptive Trade Practices*

Defendants argue that Plaintiff has failed to plead a proper claim for unfair and deceptive

trade practices under N.C. Gen.Stat. § 75-1.1 because the facts alleged do not amount to the

aggravating circumstances required for such a claim. The elements of a claim for unfair and

deceptive trade practices in violation of N.C. Gen.Stat. § 75-1.1 are: (1) an unfair or deceptive

act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which

proximately caused actual injury to the plaintiff or to his business. Id.; Gray v. N. Carolina Ins.

Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). Recovery under such a claim "is limited

to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement

or misrepresentation and he or she suffered actual injury as a proximate result of defendant's

deceptive statement or misrepresentation." McLamb v. T.P. Inc., 619 S.E.2d 577, 582-83 (N.C.

App. 2005) (internal quotation and citation omitted). A practice is unfair if it "is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to customers." Deerborne

Cottages, LLC v. First Bank, No. 1:11CV178, 2012 WL 1835240, at *5 (W.D.N.C. Apr. 9,

2012) report and recommendation adopted, No. 1:11CV178, 2012 WL 1836093 (W.D.N.C. May

21, 2012) (citation and internal quotation omitted). A practice is deceptive where it "has the

tendency or capacity to deceive." Id. A claim for unfair and deceptive trade practices turns on

the facts of each case and therefore involves a "highly fact-specific inquiry." S. Atl. Ltd. P'ship

of Tennessee, L.P. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002).

Here, Plaintiff alleges that LGC: (1) repeatedly promised Celgard that it would make Celgard

its exclusive base film supplier for EVs, (2) in order to induce Celgard to increase its production capacity to meet LGC's requirements and provide it with favorable pricing, (3) while at the same time secretly making arrangements to replace Celgard. (Document No. 217 ¶¶ 68-69, 75, 77, 90-92, 116.) The Amended Complaint further alleges that despite repeated promises to the contrary, LGC had no intention of entering into an LTA with Celgard, but strung Celgard along in order to ensure that LGC had sufficient supply of base film at discounted prices until LGC was ready to replace Celgard. Id. at ¶ 92. Then, LGC allegedly misrepresented to Celgard that the market price for comparable separator material had decreased by over 50% in an attempt to avoid its obligation in the MOU to purchase the majority of separator material from Celgard. Id. at ¶¶ 93-96, 116. The court finds that such allegations of misrepresentation and false promises fit squarely within the type of conduct that North Carolina courts have found to be in unfair and deceptive. See, e.g. Deerborne Cottages, 2012 WL 1835240, at *6. ("Put simply, Plaintiffs allege that Defendants … made affirmative misrepresentations during Plaintiffs' dealings with The Bank of Asheville, and that Plaintiffs relied upon these misrepresentations in going forward with the project. As various courts have held, affirmative misrepresentations such as these can form the basis of an unfair trade practices claim in certain circumstances."). Although whether Plaintiff will prevail on its claim will ultimately depend on the specific facts in this case, the court finds that the allegations of deception and misrepresentation alleged in the Amended Complaint are sufficient to survive dismissal at this stage of the proceedings. The court will therefore deny Defendants' motion as to the unfair and deceptive trade practices claim.

## 2. *Breach of Contract*

Defendants argue that Plaintiff's breach of contract claim cannot succeed because Plaintiff

has failed to show that the parties entered an enforceable contract. As Defendants correctly note,

"[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2)

breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 843 (N.C. App. 2000).

Defendants first argue that the MOU is not a contract because it explicitly states in the second

paragraph, "LGC and CELGARD understand that this is a non-binding MOU." See MOU

(Document No. 18-1 at 1). Here, Plaintiff claims that LGC breached the "Supplier Selection

Agreement" contained in the MOU when it failed to purchase separator material primarily from

Celgard during the Collaboration period. (Document No. 217, ¶ 127). The MOU states, "[b]oth

parties agree that except as is explicitly set forth in this MOU, neither party shall be bound by

any discussions or written proposals, letters, memos or charts used or exchanged unless and until

a definitive and binding agreement is signed." (MOU at 1). Plaintiff argues that the non-binding

language applies only to the parties' intent to enter into a long-term supply agreement, not to

their interim obligations during the Collaboration Period. Specifically, Plaintiff notes that the

MOU expressly provides that "[n]otwithstanding the foregoing":

- "LGC will purchase separator primarily from CELGARD during the Collaboration Period . . . .;"
- "Initial products to be supplied by Celgard and purchased by LGC are Celgard® trilayer products manufactured to specifications mutually agreeable to both parties;" and
- "LGC also agrees to give priority to qualifying CELGARD separator in any/all new cell applications for the EDV and ESS markets . ... .".

(MOU at 1, ¶¶ 1-3 (emphasis added)). The court finds that Plaintiff has put forth sufficiently

plausible allegations of the ambiguity of the document's intentions as to the supply of goods

during the collaboration period to render dismissal at the 12(b)(6) stage inappropriate. See

Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc., 552 F. Supp. 2d 527, 530 (M.D.N.C. 2007) ("If the agreement is ambiguous…interpretation of the contract is a matter for the jury. Ambiguity exists where the contract's language is reasonably susceptible to either of the interpretations asserted by the parties.") (internal citations and quotations omitted).

Defendants also argue that Plaintiff has failed to show the existence of a valid contract because the language of the MOU does not present definite and certain terms. See Miller v. Rose, 532 S.E.2d 228, 232 (N.C. App. 2000) ("To be enforceable, the terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness.") (internal citations and quotations omitted). The court finds that Defendants' arguments do not merit dismissal of this claim at this stage in the proceedings. While there are certainly questions as to the validity of the parties' agreement as a contract, the court finds that the language of the MOU states general terms for the parties' agreement, including the applicable time period, a quantity of separator material, price, and quality of goods for sale, that could be interpreted as a valid contract. See N.C. Gen. Stat. § 25-2-204 (providing: "1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract…[and] (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.").

The court will therefore deny Defendants' motion as to the breach of contract claim.

### 3. Breach of the Duty of Good Faith and Fair Dealing

Defendants' sole challenge to Plaintiff's claim for breach of the covenant of good faith and

fair dealing is premised on a finding that the MOU is not a valid and enforceable contract. Because the court will not dismiss Plaintiff's breach of contract claim at this time for the reasons explained above, it similarly declines to dismiss this claim. See Recycling Equip., Inc. v. E Recycling Sys., LLC, No. 5:14-CV-00056, 2014 WL 6977766, at *5 (W.D.N.C. Dec. 9, 2014) ("The implied covenant of good faith and fair dealing is a part of every contract and is breached where one party to a contract does something that injures the right of the other to receive the benefits of the agreement….Where the claim for breach of good faith is part and parcel of a similar claim for breach of an express term of the contract claim, that claim will rise and fall with the other breach of contract claim.") (internal citations and quotations omitted).

### 4. *Unjust Enrichment*

Finally, Defendants argue that Plaintiff's alternative claim for unjust enrichment should be dismissed because the facts alleged are insufficient to state a plausible claim, the claim was not properly pleaded, and the claim is barred by the statute of limitations.

In order to establish a claim for unjust enrichment, a plaintiff must allege: (1) it conferred a measurable benefit on the other party; (2) that party consciously accepted the benefit, and (3) the benefit was not conferred officiously or gratuitously. Booe v. Shadrick, 369 S.E.2d 554, 556 (N.C. 1988); Primerica Life Ins. Co. v. James Massengill & Sons Const. Co., 712 S.E.2d 670, 677 (N.C. App. 2011). Both parties acknowledge that under North Carolina law, "a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties." Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (citing Se. Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (N.C. App. 2002)). However, in the absence of an express contractual agreement, "A claim of unjust enrichment is

an alternative to a claim based on breach of contract…" <u>Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.</u>, 243 F. Supp. 2d 386, 411 (M.D.N.C. 2003).

The court fist addresses the wording of Plaintiff's alternative pleading. Defendants argue that Plaintiff's alternative claim for unjust enrichment was pleaded improperly because it incorporated all previous allegations in the Amended Complaint by reference. <u>See</u> (Document No. 217, ¶ 137); <u>Howard v. Carroll Companies, Inc.</u>, No. 1:12CV146, 2013 WL 3791619, at *12 (M.D.N.C. July 19, 2013) (dismissing claim for unjust enrichment where Plaintiff's claim did "not indicate that this claim was made in the alternative" and incorporated by reference all preceeding allegations, including those alleging the existence of the two contracts); <u>Deltacom, Inc. v. Budget Telecom, Inc.</u>, No. 5:10–cv–38, 2011 WL 2036676, at *5–6 (E.D.N.C. May 22, 2011) (declining to construe an unjust enrichment claim as an alterative claim when the complaint alleged the existence of a contractual relationship, defendant admitted to contractual relationship, plaintiff expressly incorporated by reference allegations of a contractual relationship in unjust enrichment claim, and failed to make the claim in the alternative). Here, the court finds no basis to dismiss the claim, phrased as "In the Alternative, Unjust Enrichment Against LG Chem," on the basis of Plaintiff's incorporation by reference of previous allegations because the claim was clearly made in the alternative. <u>See</u> (Document No. 217 at ¶¶ 137-38). Where, as here, Defendants deny the existence of a valid contract and Plaintiff has clearly stated that it makes its claim in the alternative to the contract claims, the court will allow the claim to proceed at this stage.

Defendant also argues that the facts Plaintiff alleges simply show that it voluntarily took steps to improve production capabilities in the hopes of gaining additional LGC business. The

court disagrees with such a characterization of the facts alleged. Here, Plaintiff has alleged that it increased its production capabilities and provided LGC with discounted pricing for base film based on promises by LGC that if Plaintiff did so, Plaintiff would become LGC's long-term, exclusive supplier of separator material for the EV industry. (Document No. 217 at ¶¶ 68, 69, 140). Plaintiff states, quite plausibly, that these benefits were not conferred gratuitously, but instead in direct response to, and in reliance on, LGC's promises. The court therefore finds no reason to dismiss Plaintiff's claim based on Defendants' argument that Plaintiff's actions were gratuitous.

The court has also carefully considered the statute of limitations issue raised by Defendants. A claim for unjust enrichment is subject to a three year statute of limitations period that runs from the date the claim accrues. Mountain Land Properties, Inc. v. Lovell, No. 2:12-CV-84-MR-DLH, 2014 WL 4542413, at *13 (W.D.N.C. Sept. 11, 2014) (citing Stratton v. Royal Bank of Canada, 712 S.E.2d 221, 229 (N.C. App. 2011); Housecalls Home Health Care, Inc. v. State, Dept. of Health & Human Servs., 682 S.E.2d 741, 744 (N.C. App. 2009); Miller v. Randolph, 478 S.E.2d 668, 670 (N.C. App. 1996)). Generally, a cause of action "accrues when the wrong is complete and, thus, a plaintiff is entitled to assert the claim in court." Id. Here, the Amended Complaint alleges that LGC strung Plaintiff along for years, but that the wrong to Plaintiff was not complete until June 20, 2013, when LGC refused to enter into the LTA and instead switched suppliers. (Document No. 217 at ¶¶ 100-01). The court there finds that Plaintiff's claim for unjust enrichment is not barred by the statute of limitations.

### C.  Conclusion

The court finds that Plaintiff has stated plausible claims for relief based on factual

allegations sufficient "to raise a right to relief above the speculative level," <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). It will therefore deny Defendants' 12(b)(6) motion.

## IV.    DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Finally, the court considers Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction pursuant to Rule 12(b)(2). (Document No. 226). Defendants argue that they are not subject to personal jurisdiction in the Western District of North Carolina under any legal theory and that they lack the requisite minimum contacts with this state to make an assertion of jurisdiction over them reasonable or fair. Plaintiff claims that both Defendants are subject to personal jurisdiction here under various theories. Specifically, Plaintiff contends that LGC is subject to specific jurisdiction through its prior business dealings here and that its placement of allegedly infringing products into the stream of commerce also satisfies personal jurisdiction. Plaintiff also argues that LGC is subject to general jurisdiction or, alternatively, nationwide jurisdiction. Plaintiff claims that LGCAI is subject to jurisdiction under the theories of general jurisdiction and its use of the stream of commerce.

### A.  Standard of Review

The plaintiff bears the burden of establishing personal jurisdiction over the defendant by a preponderance of the evidence. <u>IMO Indus., Inc. v. SEIM S.R.L.</u>, No. 305-CV-420-MU, 2007 WL 1651838, at *1 (W.D.N.C. June 4, 2007). When evaluating a motion to dismiss pursuant to Federal Rule 12(b)(2), if no evidentiary hearing is held and the court determines the question of personal jurisdictional based on affidavits and other written materials, the plaintiff need only establish a prima facie case of personal jurisdiction. <u>Electronics For Imaging, Inc. v. Coyle</u>, 340 F.3d 1344, 1349 (Fed. Cir. 2003). <u>See also</u> <u>IMO Indus.</u>, 2007 WL 1651838, at *1. Here, while

jurisdictional discovery has been permitted, no formal evidentiary hearing has been conducted to resolve disputed issues of jurisdictional fact. As such, Plaintiff must only make a prima facie case that the court has personal jurisdiction over Defendants, which "is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict." ATI Indus. Automation, Inc. v. Applied Robotics, Inc., No. 1:09CV471, 2013 WL 1149174, at *2 (M.D.N.C. Mar. 19, 2013) (quoting 2 James W. Moore, Moore's Federal Practice § 12.31[5])). In determining whether Plaintiff has made the requisite showing upon a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor. Electronics For Imaging, 340 F.3d at 1349.

## B. Legal Standards

Federal Circuit case law applies in determining whether this court has personal jurisdiction over an out-of-state accused infringer. Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994).[3] Federal courts apply the relevant state statute when determining personal jurisdiction over a defendant, even when the cause of action is purely federal. Id. at 1569. Because North Carolina's long-arm statute is co-extensive with federal due

---

[3] The court has considered whether the law of the Federal Circuit applies to both the state law claims and the claims for patent infringement in this case and notes that both parties have argued their positions on personal jurisdiction solely under the law of the Federal Circuit. See Def. Mem. Mot. Dismiss (Doc. No. 227, p. 5, n. 24); Pl. Mem. Opp. (Document No. 241, p. 14-15). The court finds that application of Federal Circuit law is appropriate here as to all of Plaintiff's claims. In 3D Systems, Inc. v. Aarotech Lab., Inc., 160 F.3d 1373, 1377–78, 48 USPQ2d 1773, 1776 (Fed.Cir.1998), the Federal Circuit held that the law of that circuit, as opposed to the regional circuit, applied in determining that the district court had personal jurisdiction over an out-of-state corporation defending claims for patent infringement and state law claims of trade libel and unfair competition where the exercise of supplemental jurisdiction was proper. See id. at 1377-78 ("Because of supplemental jurisdiction under 28 U.S.C. § 1367… the propriety of jurisdiction in light of federal due process for both the state law claims and the federal patent law claims is to be analyzed using Federal Circuit law."). The Federal Circuit found that because the patentee's trade libel and unfair competition claims went "hand-in-hand with its patent infringement claims," and because the claims arose out of the same facts, application of Federal Circuit law was appropriate in resolving the personal jurisdiction issue, even though state law claims were involved. Id. at 1377.

process requirements, the jurisdictional inquiry here collapses into a single determination of whether this court's exercise of jurisdiction over Defendants comports with due process. <u>Dillon v. Numismatic Funding Corp.</u>, 291 N.C. 674, 676 (1977). "The constitutional touchstone for determining whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum State.'" <u>Nuance Commc'ns, Inc. v. Abbyy Software House</u>, 626 F.3d 1222, 1230-31 (Fed. Cir. 2010) (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474, (1985)).

To be consistent with the limitations of due process, a defendant must have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945). Minimum contacts may be established by showing "general" or "specific" jurisdiction. <u>Helicopteros Nacionales de Columbia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984).

### *1. General Jurisdiction*

A court may exercise general jurisdiction over a non-resident defendant if the defendant has contacts with the state that are so "continuous and systematic" as to render himself "essentially at home in the forum State." <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 131 S. Ct. 2846, 2851 (2011). When a defendant maintains such systematic and continuous contacts with the forum state, even when the cause of action has no relation to those contacts, assertion of general jurisdiction is proper. <u>Grober v. Mako Products, Inc.</u>, 686 F.3d 1335, 1346 (Fed. Cir. 2012) (citing <u>LSI Indus. Inc. v. Hubbell Lighting, Inc.</u>, 232 F.3d 1369, 1375 (Fed. Cir. 2000); <u>Helicopteros</u>, 466 U.S. at 414–16)). Plaintiffs bear a "higher burden" when establishing general jurisdiction than they do when establishing specific jurisdiction. <u>Avocent Huntsville Corp. v.</u>

Aten Int'l Co., Ltd., 552 F.3d 1324, 1330 (Fed. Cir. 2008). "Sporadic and insubstantial contacts with the forum state ... are not sufficient to establish general jurisdiction." Campbell Pet Co. v. Miale, 542 F.3d 879, 884 (Fed.Cir.2008). Further, "continuous activity of some sorts within a state is not enough ... the continuous corporate operations within a state must be so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." International Shoe, 326 U.S. at 318. A court must look at the facts of each case to determine whether a defendant's activities within a state are "continuous and systematic." LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000).

### 2. Specific Jurisdiction

A court has specific jurisdiction over a defendant in a cause of action that arises out of the defendant's activities in the forum state, and "can exist even if the defendant's contacts are not continuous and systematic." Grober v. Mako Products, Inc., 686 F.3d 1335, 1346 (Fed. Cir. 2012) (citation omitted). When exercising specific jurisdiction, a court must have jurisdiction over each party as to each claim alleged. Pan-Am. Products & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 678 (M.D.N.C. 2011) (citations omitted).

In analyzing specific jurisdiction over a defendant, the Federal Circuit considers whether: "(1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair." Grober, 686 F.3d at 1346 (citing Elecs. For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003)). Plaintiff has the burden of making a prima facie showing of specific jurisdiction by satisfying the first two elements; the

burden then shifts to defendant to show that such assertion of personal jurisdiction is not reasonable and fair. Id.

### 3. Stream of Commerce

Where a defendant's contacts with the forum state are indirect and only the result of an intermediary distributorship arrangement, the Federal Circuit has explained that a "stream of commerce" theory is to be applied in lieu of the typical concepts of specific and general jurisdiction. Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 427 (Fed. Cir. 1996); see also Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed. Cir. 1994). The law governing this theory has been concisely summarized by the Federal Circuit:

> In World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298 (1980), the Supreme Court stated that a defendant could purposefully avail itself of a forum by "deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." In Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102 (1987), a plurality of four justices concluded that something more was required—"*an action of the defendant purposefully directed toward the forum state.*" Id. at 112 (emphasis in original). The cited examples of purposeful direction included "marketing through a distributor ... in the forum [s]tate" and "providing regular advice to customers." Id. Four other justices considered the showing of additional conduct unnecessary. Id. at 117.

Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1233 (Fed. Cir. 2010). Like the Supreme Court, the Federal Circuit has not yet decided whether "something more than the mere act of placing a product in the stream of commerce with the expectation that it would be purchased in the forum state" is required to establish jurisdiction. Id. at 1234 (citing Beverly Hills Fan, 21 F.3d at 1566). See also Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1332 (Fed. Cir. 2008) ("We have also applied the stream of commerce theory, although we have not resolved the split in authority reflected in the competing plurality opinions in Asahi); AFTG-

TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1365 (Fed. Cir. 2012). However, under either version of the stream of commerce theory, where an alien Defendant: 1) places the accused product into the stream of commerce, 2) knows or should know the likely destination of the product, and 3) its conduct and connections with the forum state are such that it may reasonably foresee being haled into court within that forum, exercise of jurisdiction under the stream of commerce theory is appropriate. Beverly Hills Fan, 21 F. 3d at 1566. Thus, if the manufacturer purposefully ships the accused products into the forum state through an established distribution channel, with the expectation that those products will be sold in the forum, such action is sufficient to give rise to a proper assertion of jurisdiction. Nuance Commc'ns, 626 F.3d at 1233-34.

### 4. Nationwide Jurisdiction

If neither specific nor general jurisdiction applies, a court may exercise nationwide jurisdiction under Fed. R. Civ. P. 4(k)(2). See id. (providing that "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"). Nationwide jurisdiction is appropriate where "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible." Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1415 (Fed. Cir. 2009).

### 5. Reasonability of Jurisdiction

Even where a defendant's contacts with the forum state are sufficient to satisfy personal jurisdiction, a defendant can still defeat jurisdiction "by marshaling a compelling case against jurisdiction on the grounds that its exercise would be unreasonable, [and] contrary to concepts of

fair play and substantial justice." Viam Corp., 84 F.3d at 429. This "unreasonableness" test

weighs the burden the litigation places on the defendant against the plaintiff's interest in a

convenient forum and the forum's interest in resolving the controversy. Id.; see also Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985). It is a difficult test for a defendant to pass: "these

cases are limited to the rare situation in which the plaintiff's interest and the state's interest in

adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the

burden of subjecting the defendant to litigation within the forum." Beverly Hills Fan, 21 F.3d at

1568. The inquiry under this test includes a balancing of (1) the burden on the defendant; (2) the

interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial

system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of

the states in furthering their social policies. Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d

424, 429 (Fed. Cir. 1996) (citing World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286

(1980)).

### 6. *Supplemental Jurisdiction*

28 U.S.C. § 1367(a)) provides that "in any civil action of which the district courts have

original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims

that are so related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article III of the United States Constitution." Such claims

must arise out of "a common nucleus of operative fact." United Mine Workers of Am. v. Gibbs,

383 U.S. 715, 725 (1966); accord Silent Drive, Inc. v. Strong Indus., Inc., 326 F.3d 1194, 1206

(Fed. Cir. 2003).

### C. Personal Jurisdiction over LGC

#### 1. *State Law Claims (Counts III-VI)*

##### i. Specific Jurisdiction

As noted above, assertion of specific jurisdiction is proper when the plaintiff's cause of action arises from a defendant's contacts with the forum state. The court finds that assertion of specific jurisdiction is appropriate for all of Plaintiff's claims arising under state law—unfair and deceptive trade practices, breach of contract, breach of the implied covenant of good faith and fair dealing, and alternatively, unjust enrichment—because LGC's contacts with North Carolina throughout the course of its business relationship with Plaintiff gave rise to those claims.

The court first finds that LGC purposefully directed its activities at the forum state. Here, LGC conducted business with Plaintiff, a North Carolina resident, for seven years. In that time, LGC purchased $95 million worth of separator material made in, and shipped from, North Carolina. (Document Nos. 56 ¶ 23; 242-15). The parties entered into a written MOU and extensively negotiated a written LTA for LGC's EV programs. (Document No. 18 ¶ 7, 13). Accepting Plaintiff's allegations as true, Plaintiff spent over $300,000,000 to expand its manufacturing capacity in order to meet LGC's long-term supply requirements based on LGC's representations that it would make Plaintiff its exclusive supplier of separator material for EV batteries if Plaintiff increased production capacity. Id. ¶¶ 8-10, 20. Additionally, Plaintiff states that until the expanded capacity became operational, it stopped taking orders from certain CE customers to redirect resources to meet LGC's volume requirements. Id. ¶ 18; (Document No. 172 ¶¶ 8, 11).

Throughout the course of these business dealings, LG Chem representatives extensively communicated by e-mail with Plaintiff. See e.g., Documents No. 242-1-12. See also Electronics For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1351 (Fed. Cir. 2003) (discussing Defendant's contacts with Plaintiff in the forum state by phone and noting "[Defendant's] communications are significant in the personal jurisdiction calculus even though [Defendant] was not physically present in [forum state] when he made these communications."). More significantly, LGC representatives had numerous in-person meetings in North Carolina, occurring "on about at least a quarterly basis." (Document Nos. 37 ¶ 4; 17 ¶ 11; 32 ¶ 9; 52 ¶ 8). Plaintiff has provided the following evidence that high-level LGC executives and other employees traveled to North Carolina for numerous meetings to inspect Celgard's facilities, negotiate agreements, and discuss Celgard's intellectual property rights:

- LGC officers and engineers visited and inspected Celgard facilities in Charlotte and Concord, North Carolina to certify that they met LGC specifications. (Document Nos. 18 ¶ 17; 242-18).
- In October and November 2010, LGC executives traveled to Charlotte to meet with Celgard. (Documents No. 242-7; 242-8).
- In July 2011, LGC personnel attended Celgard's Grand Opening event for the Concord, North Carolina facility. (Document No. 242-11).
- In September 2011, LGC personnel traveled to North Carolina to tour the Concord and Charlotte facilities and to discuss the expansion plan. (Documents No. 242-9; 242-10).
- In November 2012, an LGC executive traveled to Charlotte to discuss LGC's business forecast for 2013, Celgard's pricing proposals, and collaborating to develop new separator products. (Document Nos. 242-6; 56 ¶ 22).
- In February 2013, an LGC executive met in Charlotte to negotiate various options for parties' ongoing relationship, including an LTA. (Document Nos. 242-4; 242-2).
- In August 2013, representatives from LGC met with Celgard in Charlotte for a top management meeting. (Document Nos. 242-1; 242-39; 242-12; 242-29). Among other things, the parties discussed the LTA. (Document No. 242-33).
- In October 2013, LGC executive traveled to Charlotte to discuss the LTA and LGC's "use of Celgard's ceramic coating patents in LGC's current and future CE and EV batteries." (Document Nos. 242-35; 242-36; 242-20; 242-21).

- On December 9, 2013, LGC met with Celgard in North Carolina to discuss pricing and supply. (Document Nos. 37 ¶ 4; 52 ¶ 13).

The court finds that LGC's contacts with the forum state that occurred because of the parties' established commercial relationship were purposefully directed at North Carolina.  See Electronics For Imaging, Inc. v. Coyle, 340 F.3d 1344, 1351 (Fed. Cir. 2003) (finding purposeful availment where, *inter alia*, defendant repeatedly called plaintiff in forum state and sent representatives to form state for purpose of demonstrating patented technology); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985) (finding purposeful contacts even despite lack of physical ties to forum state where party "reached out" to negotiate with resident of forum state for long-term franchise agreement).

Second, the court finds that Plaintiff's state law claims arise out of LGC's contacts directed at the forum state. Plaintiff's deceptive trade practices claim is grounded in LGC's alleged misconduct regarding a product made in North Carolina, including alleged misrepresentations during meetings in North Carolina and significant capital expenses incurred in North Carolina in reliance on such alleged misrepresentations. (Document No. 217, ¶¶ 116-119). Similarly, Celgard's breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment claims are based on the MOU, which governed the North Carolina manufacture and supply of separator material. Id. ¶¶ 120-136.

Third, the court has considered whether asserting personal jurisdiction over LGC is reasonable and fair. Here, the court has considered (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies, Electronics For

Imaging, Inc. v. Coyle, 340 F.3d 1344, 1352 (Fed. Cir. 2003), and finds that LGC is unable to demonstrate that it would be unreasonable for this court to exercise jurisdiction over it.

First, litigating in North Carolina will not unreasonably inconvenience LGC. Although LGC is based in South Korea, "progress in communications and transportation has made the defense of a lawsuit in foreign tribunal less burdensome." Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico, 563 F.3d 1285, 1299 (Fed. Cir. 2009). Indeed, LGC employees traveled to North Carolina numerous times between 2008 and 2013. Additionally, LGC is apparently willing to litigate this dispute in the Eastern District of Michigan, which is not substantially closer to Korea than North Carolina, which indicates that LGC is prepared to accept the burden of travel. (Document No. 231). Second, North Carolina has an interest in adjudicating claims arising out of North Carolina law and relating to wrongs against a North Carolina citizen, as well as claims relating to infringement of a citizen's patent. See Beverly Hills Fan, 21 F.3d at 1568 ("Virginia has an interest in discouraging injuries that occur within the state….that interest extends to design patent infringement actions such as the one here.") (internal citation omitted). Third, Plaintiff has a significant interest in maintaining this action in North Carolina, as much of its evidence and witnesses knowledgeable about the patented invention are located here. As to the fourth and fifth factors, the court does not find that Defendant has offered any compelling reason why the interstate judicial system's interest in obtaining efficient resolution of controversies or the states' interest in furthering substantive social policies necessitates a finding that exercising jurisdiction over LGC is unreasonable or unfair. Accordingly, the court concludes that this case is not one of the "rare situation[s] in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly

outweighed by the burden of subjecting the defendant to litigation within the forum." Id. In light of the above analysis, the court finds that specific jurisdiction over LGC is appropriate for each of Plaintiff's state law claims.

### 2. *Patent Claims (Counts I And II)*

#### i. Supplemental Jurisdiction

The court next considers whether it is appropriate to exercise supplemental jurisdiction over Plaintiff's patent infringement claims given its finding that it has specific jurisdiction over Plaintiff's state law claims. Plaintiff argues that a common nucleus of operative facts exists here because the facts giving rise to its state law claims are substantially the same as those giving rise to its patent infringement claims. Specifically, Plaintiff contends that Celgard and LGC's seven-year relationship and LGC's decision to terminate the relationship with Celgard and source base film from an alternative source, while continuing to use or cause others to use Celgard's patented technology without permission, form a common nucleus of operative fact. Defendants argue that the facts related to the patent claims (the distribution, importation, and/or sale of the allegedly infringing product) are distinct from the facts related to the state law claims (LGC's activities in North Carolina related to its alleged obligations under the MOU), and that they are not sufficiently common to render supplemental jurisdiction appropriate. LGC points out that Plaintiff's state law claims concern the now-severed business relationship that centered on sale and purchase of Plaintiff's uncoated polymeric base film, whereas its patent infringement claims concern LGC's manufacture of ceramic coated separator product. LGC thus argues that the facts

giving rise to the alleged injuries are wholly distinct and that supplemental jurisdiction is

inappropriate.[4]

As LGC correctly notes, the base film made by Plaintiff, itself, is not the accused infringing

product. However, as explained by one of LGC's own employees, base film is a component of

the allegedly infringing ceramic-coated separators. Jina Lee, Manager in a Cell Procurement

Team at LGC, stated in her affidavit that a separator is a component of a lithium-ion battery that

is placed between the anode and the cathode to prevent electrical shorting (i.e. fire). See

(Document No. 52, ¶ 4, Declaration of Jina Lee "Lee Decl."). Additionally, Ms. Lee explained:

> There are two types of separators: "wet-type" and "dry-type". *A separator consists of a "base film" and a coating on top of the base film.* "Dry-type" separators are more susceptible to heat than "wet-type." The base film by itself (i.e., without coating)—especially the base film for "dry-type" separators—cannot be used as a separator and cannot even be considered a finished component for use in a battery because of heat safety issues. LGC does not manufacture uncoated base films for "dry-type" separators. Instead, *LGC purchases base films and then performs additional manufacturing, using its own coating technology, in order to arrive at the final, finished separator… Celgard provided to LGC uncoated base films for "dry-type" separators.*

Document No. 52, ¶ 5 (emphasis added). Accordingly, while the two products are distinct, they

are very closely related. Indeed, by Defendants' own description, base film is an essential

component of a separator.

---

[4] The court has also carefully considered Plaintiff's statements at the hearing in response to questioning by the court as to why its patent law and state law claims are related. See Hearing Transcript (Document No. 274) at 25:10-26:25; 13:1-25. To the extent Defendants construe Plaintiff's statements as allegations of theft of intellectual property in their supplemental brief (#275-1), the court is not persuaded that Plaintiff was attempting to assert a new claim against Defendants at the hearing. See id. at 26:23-5 ("They completely said, Sorry, you know, Go pound sand. We're going to go run off with your technology and work with someone else."); id. at 13:19-23 ("[LG Chem] went and learned about our technology and then they went and took it to someone else and are now infringing our patents with technology that we provided to them and that we taught them."). The court finds that Plaintiff's arguments about the relationship between its patent claims and state law claims at the hearing are consistent with the allegations and arguments it made in its Amended Complaint (Document No. 217) and its Response in Opposition to Defendants' Motion to Dismiss (Document No. 241).

LGC also argues that the facts relevant to the state law claims are "[LGC's] termination of Celgard as a supplier of uncoated base film for lithium-ion batteries" and the facts related to the patent claims are "[LGC's] manufacture, distribution, importation, and sale of lithium-ion batteries with SRS-coated separators." (Document No. 275-1, p. 2). While the court agrees, it also believes that LGC's termination of Celgard as a supplier of uncoated base film is factually intertwined with, if not the exact cause of, LGC's manufacture, distribution, importation, and sale of lithium-ion batteries with SRS-coated separators. As noted above, the '586 patent claims ceramic-coated separators and batteries or systems including such separators. (Document Nos. 17 ¶ 8; 16, p.4). Here, Plaintiff initially provided base film to LGC for use in manufacturing lithium-ion batteries for CE devices. (Document Nos. 18 ¶ 4-5; 217 ¶ 67). In 2008, Plaintiff and LGC began discussions regarding Plaintiff becoming LGC's exclusive supplier of base film for lithium-ion batteries used in EVs. (Document No. 18 ¶ 6; 217 ¶ 68). Pursuant to LGC specifications, Plaintiff designed separator material to which LGC could apply a ceramic coating. (Document Nos. 17 ¶¶ 13, 15; 80 ¶ 3; 19). Plaintiff states that once ceramic coated, this separator embodied the '586 patent, but that because LGC's use of the patent was authorized by Plaintiff at that time, the separator did not constitute infringement. See 35 U.S.C. § 271 (infringement requires use "without authority"); Pl. Resp. Def. Mot. Dismiss (Document No. 241, p.2). Upon the beginnings of the breakdown of the LTA negotiations, Plaintiff discussed its patented technology with LGC, informing LGC that if it was going to cease purchasing its base film, it needed a license to ceramic-coat any non-Celgard separator. See (Document Nos. 242-34; 242-18; 242-19; 242-21; 242-32; 242-38). The parties also discussed these patent issues during at least one of LGC's visits to Plaintiff in North Carolina. (Document No. 242-30). Plaintiff claims

that infringement is occurring because LGC is purchasing base film from third parties and applying a ceramic coating layer to such base film in order to create coated battery separators, which fall within the scope of the patent. (Document No. 217, ¶ 51). The infringement that Plaintiff claims thus arises from LGC's choice to stop using Plaintiff's base film in its separators and to source it from a third party without a license. (Document No. 17, ¶¶ 49-52; 278, p. 4).

In light of the fact that Plaintiff's claims of patent infringement arise from LGC's choice to stop using Celgard base film in its separators, which is very closely related to, if not essentially the same as, the conduct that gave rise to Plaintiff's state law claims, the court finds that a common nucleus of operative facts exists to warrant the exercise of supplemental jurisdiction. In sum, Plaintiff provided base film to Defendants for use in their separators. When the business relationship went sour, LGC sourced base film from a third party. Plaintiff alleges that the use of this third-party base film, in combination with LGC's application of ceramic coating, constitutes a battery separator that infringes upon the '586 patent. The nature of the parties' business dealings and LGC's decision to stop purchasing base film from Plaintiff after their significant history form a "common nucleus" that renders the patent claims part of the same "case or controversy" as the state law claims.

ii.     Other Jurisdictional Theories

The court has also considered whether it may exercise personal jurisdiction over LGC on independent grounds under the stream of commerce theory, particularly in light of the extensive briefing on the question and this court's recent decision in Celgard, LLC v. SK Innovation, Co., Ltd., 3:13cv254-MOC-DSC, 2014 WL 5430993 (W.D.N.C. Aug. 29, 2014), which found no personal jurisdiction over a foreign defendant under the stream of commerce theory. The

question for the court is whether LGC has purposefully shipped its allegedly infringing products through an established distribution channel with the expectation that those products would be sold in the forum. Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222, 1234 (Fed. Cir. 2010); Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed. Cir. 1994).

Here, Plaintiff has offered the following evidence in support of its argument that LGC meets this requirement:

- LGC supplies batteries containing separators for EVs sold at North Carolina dealerships, including the Cadillac ELR, Hyundai Sonata Hybrid, Kia Optima Hybrid, and Chevrolet Volt (for which LG Chem is the exclusive supplier). (Document Nos. 17 ¶¶ 16-17; 37 ¶ 5; 242-25; 242-26; 56 ¶¶ 14-18; 56-5; 80 ¶ 12; 80-2).
- Between 2011 and 2013, over 1,000 new Chevrolet Volts—each with an LGC battery— were registered in North Carolina; as were over 500 new Kia Optima Hybrids. (Document Nos. 57-4–57-6).
- In 2013, LGC supplied lithium-ion batteries for almost 26% of all plug-in EVs sold in the U.S., 56% of which contained ceramic-coated separators. (Document No. 17 ¶¶ 18-19, 23).
- LGC also sells batteries with separators for use in popular CE devices manufactured by Apple, Hewlett Packard, Nokia, Dell, and LG Electronics, among others. (Document Nos. 17-5, p. 3; 17-10, p. 5; 136, p. 6). These CE devices are widely sold and distributed in North Carolina, including by retailers like Best Buy, Target, and Walmart.[5] (Document Nos. 56 ¶ 25; 136, p. 6).
- LGCAI markets and distributes LGC's products in the U.S. (Document No. 33 ¶ 2).

---

[5] Simple internet searches indicate that in the Charlotte, North Carolina area alone, Best Buy has at least nine retail stores, see http://www.bestbuy.com/site/olspage.jsp?id=cat12092&type=page&_requestid=100835, Wal-Mart has at least nine retail stores, see http://www.walmart.com/store/finder?location=charlotte, north carolina&distance=10, and Target has four retail stores, see http://www.target.com/store-locator/search-results?address=charlotte%2C+north+carolina&fromPage=findStore. Apple has two retail stores in Charlotte and five retail stores in the state of North Carolina, see https://www.apple.com/retail/storelist/.

The court also notes that in defending its motion to stay the preliminary injunction against it in this case, LGC went to great lengths to describe the expanse of its participation in the U.S. economic markets:

> Defendants sell in the order of $ 0.76 million every day attributable to the accused batteries sold or imported into the United States . . . . Worldwide, that number jumps to $6 million in daily sales. Defendants have yearly revenue of $278 million attributable to the accused batteries sold or imported into the United States (and $2.4 billion worldwide) . . . . Beyond that, Defendants do business *every day* with companies at the center of the U.S. economy.

(Document No. 136, p.4) (emphasis in original). Defendants further described the alleged consequences of such injunction and its use of nationwide distribution channels to distribute infringing goods:

> In light of the broad scope of the Order, Defendants will be barred from making sales in the United States to downstream customers in consumer electronics (*e.g.*, Apple, Hewlett-Packard, and Dell) and the automotive industry (*e.g.*, General Motors and Ford Motor Company), and the impact of the Order will clearly be detrimental to these customers. Taken to its logical conclusion, not only will the Order take Defendants' batteries "off the shelves" but it also strips Best Buy and Wal-Mart (with respect to consumer electronics products) and car dealerships and distributors of their ability to provide products containing these batteries to consumers. Ultimately, the effect of this Order to a John Doe member of the public is not that he may have to buy a higher priced good, but that there will be no goods for him to buy.

Id. at 6 (footnote omitted).

The court has very carefully considered the evidence put forth by Plaintiff and agrees that LGC has knowingly and intentionally used nationwide distribution channels for its products, with the expectation that its products will be sold throughout the country, including in the state of North Carolina. However, the court finds that Plaintiff has not made the requisite showing that LGC ever placed the allegedly infringing product into the stream of commerce or that such product was offered for sale here. See Nuance Commc'ns, 626 F.3d at 1234; Beverly Hills Fan,

21 F.3d at 1566 (both requiring that for exercise of jurisdiction under the stream of commerce theory to be proper, Defendants must have placed the "accused product" in the stream of commerce). See also Celgard, LLC v. SK Innovation Co., No. 3:13-CV-00254-MOC, 2014 WL 5430993, at *4 (W.D.N.C. Aug. 29, 2014) (finding that stream of commerce theory did not succeed where "plaintiff has provided this court with no indication that [defendant] has ever made a sale or even an offer of sale in North Carolina and none of SKI's products have been found in this forum."). Plaintiff's patent infringement claims are premised upon LGC using non-Celgard base film in its separators. Plaintiff admits that when LGC used Celgard base film in its separators, the manufacture of such separators did not constitute infringement because LGC's use of the patent was authorized by Plaintiff at that time. Pl. Resp. Def. Mot. Dismiss (Document No. 241, p.2). It is difficult for this court to find that the allegedly infringing product has been placed in the stream of commerce when Plaintiff has failed to submit any evidence that LGC has placed a separator with non-Celgard base film in the stream of commerce, let alone shown that one was offered for sale in this state. As Defendants note,

> By Celgard's own timeline, it takes four to six months to incorporate a base film into an LGC lithium-ion battery. (Paulus Decl. ¶ 8, Dkt. 80.) Celgard also maintains that LGC "consumed or otherwise used" Celgard base film at least until January 2014. (Id. at ¶ 7.) Celgard, however, does not estimate how long it takes for an LGC lithium-ion battery to be incorporated into an EV or CE downstream product, nor does Celgard estimate how long it takes before an assembled EV will ship out to a dealer in North Carolina or a CE downstream product will reach big box stores, like Wal-Mart or Best Buy.

(Def. Reply, Document No. 247, n.3). Plaintiff has simply offered no evidence that an LGC product with an allegedly infringing separator has been found in this forum. The court will not assume that the LGC separators found in this state within the EV and CE devices sold here are those accused of infringement, particularly when Plaintiff admits that until fairly recently, LGC

separators shipped from South Korea to the US were not infringing. Plaintiff's evidence that LGC sells products with separators in this state, alone, is not sufficient to support a finding of jurisdiction under a stream of commerce theory.

Because the court has found that LGC is subject to jurisdiction here through supplemental jurisdiction, it will not address Plaintiff's alternative argument that LGC is subject to nationwide jurisdiction under Rule 4(k)(2). Similarly, because the court believes that the exercise of jurisdiction over LGC under the theory of supplemental jurisdiction is appropriate, it will not undergo further analysis of whether LGC's contacts with North Carolina are so systematic and continuous as to render it subject to general personal jurisdiction here.

### D. Personal Jurisdiction over LGCAI

The court next considers whether Plaintiff has established a prima facie case of personal jurisdiction over LGCAI. As noted above, LGCAI, a wholly-owned subsidiary of LGC, is a Delaware company headquartered in Englewood Cliffs, New Jersey. See Declaration of Juan (S.H.) Oh ("Juan Decl."), (Document No. 33), ¶ 2; Def. Mem. Mot. Dismiss (Document No. 227), p. 4). LGCAI is responsible for marketing LGC petrochemicals, information and electronic materials, and batteries to customers in the United States. (Juan Decl, ¶ 2). LGCAI also acts as a product distributor for LGC's customers in the U.S. and is responsible for sales and program management to U.S. customers, but has no direct involvement with the manufacture of LGC products and does not share any officers with LGC. Id.

Relevant to LGCAI's contacts with the state of North Carolina, LGCAI has no offices, employees, telephone listing, post office box, mailing address, bank account, or advertising in North Carolina. Id. at ¶ 3. LGCAI does not own or rent any real property in North Carolina. Id.

However, LGCAI is registered with the Secretary of State of North Carolina to do business here and has a registered agent for service of process here. Id. In the past, LGCAI stored inventory in one of its customer's consignment warehouses here, though it has not stored any inventory there since 2013. Id. LGCAI also paid taxes to the state of North Carolina in 2012 related to storing such inventory. (Document No. 217 at ¶ 43; Def.'s Mem. Sup. Mot. Dismiss (Document No. 227, p. 16)). Additionally, between 2009 and 2013, LGCAI had seven customers in North Carolina (unrelated to the products accused of infringement). (Juan Decl. at ¶ 4). LGCAI sold over $14 million worth of products to these customers during that time, which Defendant states accounted for, on average, approximately 0.9% of LGCAI's total revenues in the United States during that period. Id. at ¶ 4. LGCAI admits that it "conducts business from time to time in North Carolina for the purpose of selling products for its petrochemical and toner businesses." Id.

Plaintiff argues that LGCAI is subject to general jurisdiction because even though LGCAI is a non-resident and its contacts are unrelated to Plaintiff's causes of action for patent infringement, its contacts with North Carolina are "continuous and systematic." As noted above, sporadic, insubstantial contacts with the forum state are insufficient to establish general jurisdiction. While there is no precise test for determining general jurisdiction, LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000), courts have generally focused on two areas of inquiry. Ashbury Int'l Grp., Inc. v. Cadex Defence, Inc., No. 3:11CV00079, 2012 WL 4325183, at *4 (W.D. Va. Sept. 20, 2012). First, they look for physical presence in the forum state, such as corporate facilities, bank accounts, agents, registration, or incorporation. Id. (citing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952)). Second, "courts have also considered whether the defendant has actively solicited business in the forum state and the extent

to which the defendant has participated in the state's economic markets....In other words, courts have examined the "economic reality" of the defendant's activities in the forum state." Id. (internal citation omitted). See also Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1533 (10th Cir. 1996) (noting that courts consider "(1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.") (cited with approval as a non-exhaustive set of appropriate factors in Delta Sys., Inc. v. Indak Mfg. Corp., 4 F. App'x 857 (Fed.Cir. 2001) (unpublished)).

Here, LGCAI has physical presence in the state of North Carolina in the form of being registered to do business here, having a registered process agent here, using property in this state for storage, and paying state taxes at least once. Additionally, LGCAI has participated in the economic markets of this state through its sales to North Carolina customers. As noted above, Plaintiffs have submitted evidence that LGCAI sold over $14 million worth of products to seven customers in the state between 2009 and 2013. (Juan Decl., ¶ 4; Lee Decl. (Document No. 242), ¶ 47-53). These sales accounted for, on average, approximately 0.9% of LGCAI's total revenues in the United States during that time (0.9 % in 2010, 1% in 2011%, 1% in 2012, and 0.8% in 2013). Id. Though the parties dispute the significance of these sales and revenue percentages, the court notes that "just as it would be inappropriate to permit an exercise of personal jurisdiction solely on the presence of sales into the forum…it would likewise be inappropriate to entirely disregard a defendant's sales into the forum simply because they only generated a small

percentage of the defendant's total revenue." ATI Indus. Automation, Inc. v. Applied Robotics, Inc., No. 1:09CV471, 2013 WL 1149174, at *4 (M.D.N.C. Mar. 19, 2013) (internal citation and quotation omitted). Here, though LGCAI earned only a small percentage of its revenue from customers in North Carolina, the dollar figure is by no means insignificant. Additionally, LGCAI earned revenue from such sales for each of the four years before the complaint was filed in this action. The court therefore finds such sales an appropriate factor for consideration. See id. at *5 (finding that defendant's sales to North Carolina were appropriate for consideration where they constituted 1.2% of annual sales, and distinguishing Campbell Pet Co. v. Miale, 542 F.3d 879, 884 (Fed. Cir. 2008), wherein Federal Circuit affirmed district court's finding of no general jurisdiction over defendants who made only 12 sales to Washington residents in eight years, for a total of less than $14,000 in gross revenue (approximately 2% of total sales), and in four of those years made no sales in Washington at all).

While this case presents a close call, the court finds that the evidence of LGCAI's physical presence in North Carolina, as well as its participation in the state's economic markets through its sales to companies here, is sufficient to support a prima facie case of general jurisdiction. See LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1375 (Fed. Cir. 2000) (finding that non-resident defendant had continuous and systematic contacts with forum state partially based on millions of dollars of sales in the state, despite lack of sale of the allegedly infringing product in forum state); Ashbury Int'l Grp., Inc. v. Cadex Defence, Inc., No. 3:11CV00079, 2012 U.S. Dist. LEXIS 134878, at *6 (W.D. Va. Sept. 20, 2012) (finding sales of millions of dollars of products to repeat customers sufficient for general jurisdiction, even absent traditional factors indicating physical presence in forum state).

The court also finds that the exercise of general jurisdiction over LGCAI at this point is reasonable and that LGCAI has failed to meet its burden of showing otherwise. First, litigating in North Carolina will not unreasonably inconvenience LGCAI. LGCAI has its principal place of business in New Jersey and its marketing and sales office for the accused lithium-ion batteries is in California. As noted above, "progress in communications and transportation has made the defense of a lawsuit in foreign tribunal less burdensome." Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico, 563 F.3d 1285, 1299 (Fed. Cir. 2009). The court, having already found that LGC, a company headquartered in Korea, will not be unreasonably inconvenienced by litigating here, declines to find that a company headquartered in this country would be so inconvenienced. Additionally, LGCAI is apparently willing to litigate this dispute in the Eastern District of Michigan, which is not substantially closer to California or New Jersey than North Carolina, which indicates that LGCAI is prepared to accept the burden of travel. The court finds that the same analysis applies to LGCAI as to LGC for the remaining four factors for consideration. As noted above, North Carolina has an interest in adjudicating claims relating to infringement of a citizen's patent. Plaintiff has a significant interest in maintaining this action in North Carolina, as much of its evidence and witnesses knowledgeable about the patented invention are located here. Defendant has not offered any compelling reason why the interstate judicial system's interest in obtaining efficient resolution of controversies or the states' interest in furthering substantive social policies necessitates a finding that exercising jurisdiction over LGCAI is unreasonable or unfair. As with LGC, the court finds that LGCAI has not met its burden of showing that being subject to personal jurisdiction here would be unreasonable. In

light of the above analysis, the court finds that the exercise of general jurisdiction over LGCAI is appropriate for Plaintiff's patent law claims.

Plaintiff also argues that LGCAI is subject to personal jurisdiction under the stream of commerce theory because it participates in the same distribution chain for LGC's batteries as LGC. The court finds such argument futile in light of the above finding that Plaintiff has failed to show LGC is subject to jurisdiction under such theory, let alone offered any argument as to how any action of LGC can be imputed to LGCAI.

**V.      CONCLUSION**

For the reasons stated herein, the court finds that this maintenance of this action is appropriate in this district at this time.

**ORDER**

**IT IS, THEREFORE, ORDERED** that:

1) Defendants' "Objections to Magistrate Judge's Order Granting Defendants' Alternative Motion to Transfer Venue" (Document No. 266) are **SUSTAINED in part and OVERRULED in part**, as described herein;

2) The Order of the Magistrate Judge transferring venue (Document No. 262) is **REVERSED** and Defendants' Alternative Motion to Transfer Venue to the Eastern District of Michigan (Document No. 230) is **DENIED**;

3) Defendants' Motion to Dismiss Counts III-VI of Plaintiff's First Amended Complaint for Failure to State a Claim (Document No. 222) is **DENIED**; and

4) Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction (Document No. 226) is **DENIED**.

Signed: May 21, 2015

Max O. Cogburn Jr.
United States District Judge